**FILED**
**United States Court of Appeals**
**Tenth Circuit**

**January 11, 2016**

**Elisabeth A. Shumaker**
**Clerk of Court**

**PUBLISH**

**UNITED STATES COURT OF APPEALS**

**FOR THE TENTH CIRCUIT**
_____

JAMES CHANDLER RYDER, by and
through his Next Friend, Sue Ryder,

     Petitioner - Appellant,

v.

MAURICE WARRIOR,[1] Interim Warden,
Oklahoma State Penitentiary,

     Respondent - Appellee.

No. 13-7073

_____

**Appeal from the United States District Court**
**for the Eastern District of Oklahoma**
**(D.C. No. 6:05-CV-00024-JHP-KEW)**
_____

Patti Palmer Ghezzi, Assistant Federal Public Defender (Randy A. Bauman, Assistant
Federal Public Defender with her on the briefs), Oklahoma City, Oklahoma, for
Petitioner-Appellant.

Jennifer J. Dickson, Assistant Attorney General (Jennifer L. Crabb, Assistant Attorney
General, and E. Scott Pruitt, Attorney General of Oklahoma, with her on the briefs),
Oklahoma City, Oklahoma, for Respondent-Appellee.
_____

Before **TYMKOVICH**, Chief Judge, **PHILLIPS**, and **McHUGH**, Circuit Judges.
_____

[1] Anita Trammell retired as Warden of the Oklahoma State Penitentiary on
October 28, 2015 and has been succeeded by Interim Warden Maurice Warrior.
Warden Warrior has thus replaced Warden Trammell as Respondent-Appellee in this
matter. *See* Fed. R. App. P. 43(c) ("When a public officer who is a party to an appeal
or other proceeding in an official capacity . . . ceases to hold office[,] . . . [t]he public
officer's successor is automatically substituted as a party.").

**McHUGH**, Circuit Judge.

_____

## I.    INTRODUCTION

Petitioner-Appellant James Chandler Ryder, an Oklahoma state prisoner who was convicted of murder and sentenced to death, appeals from the district court's denial of his petition for writ of habeas corpus. In a prior unpublished order, we granted a certificate of appealability on three issues: (1) whether the district court erred in denying Mr. Ryder a definite stay of his habeas proceedings based on his incompetency; (2) whether Mr. Ryder was incompetent to stand trial and whether the procedures employed by Oklahoma to assess his competency violated his constitutional right to the effective assistance of counsel; and (3) whether Mr. Ryder's trial counsel was ineffective in failing to fully investigate his mental health and background as they related to competence to stand trial and his mitigation case at sentencing, and whether appellate counsel was ineffective for failing to raise the ineffective-assistance-of-trial-counsel claim. Applying the deferential standard required under the Antiterrorism and Effective Death Penalty Act of 1996 (AEDPA), we affirm the district court's denial of Mr. Ryder's petition for habeas relief.

## II. BACKGROUND

### A. Factual History

The facts underlying Mr. Ryder's conviction are largely undisputed.[2] On April 8, 1999, after an ongoing dispute over personal property Mr. Ryder had been storing at the residence of Daisy Hallum and her adult son Sam Hallum, Mr. Ryder killed the Hallums. The property in dispute consisted of supplies Mr. Ryder had collected in preparation for a world-ending apocalypse he believed would occur on January 1, 2000. Mr. Ryder planned to depart for the Yukon region of Canada in the spring of 1999 because he believed the Yukon was the only place he could survive the pending apocalyptic event. When his plans were frustrated by the Hallums' refusal to return his property, Mr. Ryder went to the Hallums' home and beat Daisy Hallum to death and shot and killed Sam Hallum.

### B. State Criminal Trial, Appeal, and Postconviction Proceedings

#### 1. Criminal Trial

The State charged Mr. Ryder with two counts of first-degree murder. The State offered Mr. Ryder a plea agreement of two concurrent life sentences, with the possibility of parole in as early as fifteen years. Mr. Ryder rejected the plea agreement, stating to the trial court, "if I am found guilty and y'all kill me I will be free anyway. Let's see what happens."

---

[2] This factual summary borrows extensively from the Oklahoma Court of Criminal Appeals (OCCA) presentation of the facts in its direct review of Mr. Ryder's trial. *Ryder v. State*, 83 P.3d 856 (Okla. Crim. App. 2004). We presume a state court's factual findings to be correct unless the petitioner rebuts that presumption by "clear and convincing evidence." 28 U.S.C. § 2254(e)(1).

Less than two weeks before trial, psychologist Dean P. Montgomery issued a report to Mr. Ryder's trial counsel in which he opined that Mr. Ryder suffered from a longstanding schizoid personality disorder and was incompetent to assist in his own defense. But based on Mr. Ryder's interactions with counsel and participation in preparing his defense, trial counsel did not have a "good faith doubt" as to Mr. Ryder's competency to stand trial. Counsel therefore did not raise the issue of competency at that time.

Mr. Ryder's case went to trial and a jury convicted him on both first-degree-murder counts. Following Mr. Ryder's convictions, but before the sentencing phase commenced, defense counsel filed an application for a determination of competency. *See* Okla. Stat. tit. 22, § 1175.2. The application was supported by Dr. Montgomery's report, which explained that although Mr. Ryder at times presented himself as competent, he demonstrated a pattern of resisting counsel and refusing to reveal mitigating evidence, including refusing to allow his family to testify on his behalf.

The trial court held a hearing on the application, out of the presence of the jury. At the hearing, trial counsel expressed concerns that Mr. Ryder had refused to assist in preparation for the sentencing phase and had instructed counsel not to offer any mitigating evidence. The trial court denied the request for a separate competency hearing and instead called Mr. Ryder to the stand to assess his competency to waive his mitigation case.[3] During his colloquy with the court, Mr. Ryder assured the judge

---

[3] In assessing Mr. Ryder's competency, the trial court followed the guidelines set forth in *Wallace v. State*, 893 P.2d 504, 512–13 (Okla. Crim. App. 1995).

4

that he understood he had been convicted on two counts of first-degree murder and the State was pursuing the death penalty. He further attested that he understood the purpose of mitigation evidence. Mr. Ryder testified that he did not want to present any mitigation evidence because he preferred the death penalty to life in prison without parole. Mr. Ryder also expressed his own belief that he was competent to make that decision. In response to questions from the court, Mr. Ryder denied having ever been treated for a mental illness, stating, "No, nothing [is] wrong with me."

After concluding its colloquy with Mr. Ryder, the court asked defense counsel to identify the proposed mitigation witnesses and the nature of their expected testimony. Counsel proceeded to describe the various witnesses they hoped to call, including family members, acquaintances, and prison staff. During this presentation, Mr. Ryder became upset, interrupting counsel and stating "I've heard all I need to. . . . Get me out of here. I do not want any second stage. Nobody to testify. And if I don't have that right, then get me out of here."

Defense counsel next called Mr. Ryder's mother, Sue Ryder, to testify on the competency issue. Not wishing to hear his mother's testimony, Mr. Ryder left the courtroom. Ms. Ryder then described her interactions with Mr. Ryder shortly before the murders took place and stated she believed he was severely depressed. She also testified that Mr. Ryder spent much of his time helping others, that he hated being in enclosed spaces, and that he asked her not to testify as a mitigation witness.

Mr. Ryder was then brought back into the courtroom. The court confirmed with Mr. Ryder that he wished to waive his mitigation case and that he understood the strong likelihood he would receive the death penalty as a result.

The trial court then ruled Mr. Ryder was competent to stand trial and to waive his right to present mitigating evidence. The court also found Mr. Ryder had knowingly and voluntarily done so. Next, defense counsel argued that although Mr. Ryder had the right to waive his mitigation case under the Eighth Amendment, counsel still had a Sixth Amendment obligation to provide effective assistance. Counsel therefore requested that the court permit the defense to call two mitigation witnesses who were not among the family members Mr. Ryder had explicitly asked to not testify. The court granted this request and stated it would not foreclose counsel from calling mitigation witnesses.

During the sentencing phase, the State put forward evidence of three aggravating factors it claimed supported a sentence of death: Daisy Hallum's death was especially cruel, heinous, and atrocious; Mr. Ryder knowingly created a grave risk of death to more than one person; and there existed a probability that Mr. Ryder would commit acts of violence that would constitute a continuing threat to society. After the State rested, Mr. Ryder left the courtroom for the defense's presentation of its mitigation evidence. Defense counsel called family friend Sue Epley and jail staff member Sue Watkins. Ms. Epley testified that she had known Mr. Ryder for several years and he was honest, decent, hardworking, and not violent, but he was a loner who often talked about going to the Yukon in anticipation of the end of the world.

6

Ms. Watkins, a dispatcher at the county jail where Mr. Ryder was then incarcerated, testified that Mr. Ryder was quiet and gave no problems to jail staff or other inmates.

The jury then deliberated and recommended a sentence of life in prison without parole for Sam Hallum's murder and death for Daisy Hallum's murder. The trial court sentenced Mr. Ryder accordingly.

## 2. Direct Appeal, Retrospective Competency Hearing, and State Postconviction Proceedings

Mr. Ryder appealed his conviction and sentence to the OCCA. On appeal, Mr. Ryder was represented by new counsel, Gloyd L. McCoy.[4] He argued, among other things, that the trial court erred in failing to make a proper competency determination prior to the sentencing phase and that trial counsel rendered ineffective assistance by failing to notify the court of the competency issues before trial and by failing to present an adequate mitigation case. The OCCA remanded the case to the trial court to conduct a hearing to determine whether a retrospective competency trial was feasible, and, if so, to conduct such a trial to determine whether Mr. Ryder had been competent to stand trial. On remand, the trial court determined that a retrospective competency hearing was feasible.

The trial court thus began the process of selecting a jury to determine whether Mr. Ryder had been competent to stand trial. During voir dire, defense counsel told

---

[4] Mr. McCoy was subsequently suspended from practicing law for two years beginning in September 2010. *State ex rel. Okla. Bar Assoc. v. McCoy*, 240 P.3d 675 (Okla. 2010). Mr. McCoy was disciplined by the Tenth Circuit in 2007, Order at 5–6, *In re McCoy*, No. 07-819 (10th Cir. Aug. 10, 2007), and was disbarred from practicing before the Tenth Circuit in 2010, Order at 2, *In re McCoy*, No. 10-802 (10th Cir. Mar. 5, 2010).

the jury venire that Mr. Ryder was on death row and asked whether the prospective jurors could give him a fair hearing, despite that fact. Later, during the prosecution's voir dire, a prospective juror raised the fact that Mr. Ryder was on death row, and the prosecution explained that Mr. Ryder had been convicted of capital murder. The juror then inquired whether Mr. Ryder would be taken off death row or whether his case would be overturned if the jury determined he was incompetent. The court instructed the jury that its only concern was competency and the OCCA would decide what happens after the resolution of that issue.

Once the jury was empaneled, defense counsel called one witness, Dr. Montgomery. Dr. Montgomery discussed his 2000 and 2002 evaluations of Mr. Ryder, including the results of the MacArthur Competence Assessment Tool-Criminal Adjudication (MacCAT-CA), a test designed to assess the competency of criminal defendants. Dr. Montgomery testified that the MacCAT-CA results showed Mr. Ryder's competency to stand trial was questionable in that he was uncooperative with counsel and did not seem to be acting in his own best interest by withholding evidence, refusing to cooperate in any plea agreements, and refusing to allow his family to assist defense counsel. Dr. Montgomery further explained that although he had diagnosed Mr. Ryder with a schizoid personality disorder in 2000, his 2002 evaluation led him to believe that Mr. Ryder suffered from a more severe, delusional disorder under the schizophrenic group of disorders. This diagnosis was based on Mr. Ryder's hyperreligiosity, his delusions about the end of the world, his desire to

8

live off the land in the Yukon, and other information Dr. Montgomery obtained through the historical records defense counsel provided in 2002.

After the defense rested, the State called three witnesses: Charlie Rogers, a deputy sheriff at the county jail where Mr. Ryder was incarcerated during his trial; Judge Thomas M. Bartheld, who had presided over Mr. Ryder's criminal trial;[5] and Charlie Mackey, the Oklahoma State Bureau of Investigation agent who worked on Mr. Ryder's case. Each of the State's witnesses testified as to their interactions with Mr. Ryder before and during his criminal trial and their perceptions as to his participation in and understanding of the trial proceedings. After the State rested, the jury found Mr. Ryder had been competent during his original criminal trial.

Mr. Ryder then refiled his direct appeal to the OCCA, challenging both his underlying criminal trial and the retrospective competency trial. *See generally Ryder v. State*, 83 P.3d 856 (Okla. Crim. App. 2004). The OCCA denied relief on all grounds and affirmed Mr. Ryder's conviction and sentence. *Id.* at 879.

Mr. Ryder then applied for postconviction relief with the OCCA, but the court denied the application on all grounds. *Ryder v. State*, No. PCD-2002-257 (Okla. Crim. App. Mar. 18, 2004). Mr. Ryder filed a petition for writ of certiorari to the U.S. Supreme Court, which the Court denied. *Ryder v. Oklahoma*, 543 U.S. 886 (2004) (mem.).

---

[5] Judge Bartheld had presided over the feasibility hearing, but when he learned the State planned to call him as a witness, he recused himself from the retrospective competency trial.

9

## C. Federal Habeas Corpus Proceedings

### 1. Habeas Petition

In September 2005, Mr. Ryder filed a timely petition for writ of habeas corpus in the United States District Court for the Eastern District of Oklahoma. In his petition, Mr. Ryder raised eleven grounds for relief and requested equitable tolling and abeyance of his habeas proceedings based on his incompetency. In arguing for a competency-based tolling and abeyance, Mr. Ryder relied on an evaluation conducted and a report written by Dr. Raphael Morris, a board certified psychiatrist retained by habeas counsel to assess Mr. Ryder's mental health. Dr. Morris diagnosed Mr. Ryder with schizophrenia, paranoid type, and opined that "Mr. Ryder did not (at the time of trial) and does not now demonstrate the requisite rational understanding of his legal predicament" and that his "delusions adversely impact on his ability to assist current counsel and to access defense resources." Accordingly, counsel requested a stay of Mr. Ryder's habeas case "until such time that he is restored to competency." Two years later, habeas counsel renewed the motion for equitable tolling and abeyance, asserting Mr. Ryder's mental health had deteriorated significantly since he filed his initial habeas petition, making "even the most basic communication next to impossible."

### 2. Mental Health Evaluations

The district court ordered an evidentiary hearing and referred the matter to the magistrate judge to determine Mr. Ryder's competency. The magistrate judge ordered Mr. Ryder to undergo a psychiatric examination by Federal Bureau of Prison (BOP)

psychologist, Dr. Lee Ann Preston-Baecht. As part of her evaluation, Dr. Preston-Baecht requested Mr. Ryder's historical and medical documentation, but the magistrate judge denied the request in an effort to ensure an unbiased evaluation. Dr. Preston-Baecht therefore evaluated Mr. Ryder, without the benefit of his historical records, over the course of several weeks while he stayed at a federal mental-health facility.

In her 2008 final report, Dr. Preston-Baecht concluded that although Mr. Ryder "appeared religiously preoccupied and often expressed unusual ideas," he did not appear to express "any obviously delusional ideation." In regard to a mental health diagnosis, Dr. Preston-Baecht explained that she had been unable to make a conclusive diagnosis, faulting her lack of access to Mr. Ryder's historical records. Despite this admitted inability to definitively diagnose Mr. Ryder, Dr. Preston-Baecht opined that Mr. Ryder "appears to have a rational understanding of the nature and potential consequences of the proceedings in which he is now engaged" and "despite his irritable mood, hyper-religiosity and tangential speech, Mr. Ryder demonstrated . . . the ability to effectively and rationally assist and communicate with his counsel." Dr. Preston-Baecht thus opined that although Mr. Ryder likely suffers from an undiagnosed mental health condition, he was competent to assist with the habeas proceedings.

A few months later, the State filed a motion for leave to provide Dr. Preston-Baecht with the historical documentation previously withheld. The district court granted the motion, and upon reviewing Mr. Ryder's historical information,

11

Dr. Preston-Baecht requested an opportunity for further evaluation. The district court granted the request, and, in the presence of counsel, Dr. Preston-Baecht conducted a one-day interview of Mr. Ryder at the prison where he was incarcerated. During this second evaluation, Dr. Preston-Baecht administered the MacCAT-CA competency test. She had not administered the MacCAT-CA during her prior evaluation because Mr. Ryder had refused to cooperate.

In her 2009 follow-up report, Dr. Preston-Baecht concluded that Mr. Ryder's "mental state had deteriorated significantly" since her 2008 examination. The report discussed Mr. Ryder's rapid, often incoherent and tangential speech reflecting his various delusions, and indicated that Dr. Preston-Baecht found it difficult, if not impossible, to redirect Mr. Ryder from discussing his delusions. Based on her observations of Mr. Ryder's changed condition and her review of his historical records, Dr. Preston Baecht concluded that Mr. Ryder suffers from a psychotic disorder, most likely schizophrenia, paranoid type. Dr. Preston-Baecht also reported that the results of the MacCAT-CA competency test confirmed that Mr. Ryder was incompetent and that without treatment, his condition would likely get worse.

### 3. Competency Hearing

The parties thereafter entered into a proposed stipulation, which provided that if Dr. Morris and Dr. Preston-Baecht were called to testify, they would both offer testimony that Mr. Ryder was not competent to proceed in habeas and that the State would not call any witnesses to rebut this testimony. Accordingly, the magistrate judge entered a Report and Recommendation concluding that Mr. Ryder was

"incompetent in theses habeas corpus proceedings." Based on this Report and Recommendation, the district court ordered an evidentiary hearing to determine, among other things, whether Mr. Ryder was incompetent when the statute of limitations on his habeas petition ran, and if not, when he became incompetent. At the evidentiary hearing, the court heard from Dr. Morris, who opined that Mr. Ryder had been incompetent since well before his habeas proceedings commenced, and from Dr. Preston-Baecht, who opined that Mr. Ryder had been incompetent since at least 2009, when she conducted her second evaluation. When asked why her 2008 and 2009 evaluations produced such starkly different results, Dr. Preston-Baecht suggested that Mr. Ryder may have been guarded during the first evaluation because he knew he would be psychologically evaluated while at the BOP mental-health facility. In contrast, she conducted the second evaluation in the prison where Mr. Ryder had been incarcerated for years, "he was on his own turf," his attorneys were present, and he did not know the precise purpose of the visit. Dr. Preston-Baecht opined that these circumstances may have "allowed [Mr. Ryder] to let his guard down." She added that although the background information helped her reach a more accurate mental illness diagnosis in 2009, it was the difference in his behavior between the first and second evaluation that really changed her opinion as to competency.

## 4. District Court's Rulings

A few months later, the district court entered its findings of fact and conclusions of law. The court found that Mr. Ryder suffers from paranoid

13

schizophrenia, which had worsened over time and will continue to get worse without treatment. The court concluded that even though Mr. Ryder may have been suffering from this mental illness at the time he filed his habeas petition, he had failed to show by a preponderance of the evidence that he was incompetent on October 4, 2005, when the statute of limitations on his habeas petition ran. Relying on Dr. Preston-Baecht's 2008 evaluation, the court concluded that Mr. Ryder demonstrated a sufficient degree of rational understanding to be deemed competent as of the date of that evaluation, but that he became legally incompetent sometime thereafter. The court held that because Mr. Ryder was competent when the statute of limitations expired, and because, under AEDPA, habeas review is limited to the record that was before the state court, equitable tolling was not required. But due to Mr. Ryder's incompetency, the court appointed his mother to act as his next friend to decide on the appropriate medical treatment for Mr. Ryder and to determine, with the assistance of counsel, his best legal options.

The district court subsequently issued an order and final judgment denying Mr. Ryder's request for habeas relief and denying a COA on all grounds. *Ryder ex rel. Ryder v. Trammell*, No. CIV-05-0024-JHP-KEW, 2013 WL 5603851 (E.D. Okla. Oct. 11, 2013). Mr. Ryder timely appealed and moved this court for a COA on five issues relating to prior competency determinations, ineffective assistance of counsel, and cumulative error. In an unpublished order, we granted Mr. Ryder a COA as to three issues: (1) whether the district court erred in denying Mr. Ryder a definite stay of his habeas proceedings to determine whether he has claims that could substantially

14

benefit from his assistance and to determine the likelihood that he would regain competency in the foreseeable future; (2) whether Mr. Ryder was incompetent to stand trial and whether the procedures employed by Oklahoma to assess his competency violated his due process and Sixth Amendment rights; and (3) whether Mr. Ryder's trial and appellate counsel were ineffective in failing to fully investigate his mental illness and background as it related to both his competency to stand trial and as mitigating evidence that would have prevented the imposition of the death penalty. Our jurisdiction arises under 28 U.S.C. §§ 1291, 2253(c)(1)(A) and is limited to the three issues for which we granted a COA. *See Miller-El v. Cockrell*, 537 U.S. 322, 335–36 (2003); *Jones v. Warrior*, 805 F.3d 1213, 1218 (10th Cir. 2015).

## III.    DISCUSSION

### *A. Competency-Based Stay of Habeas Proceedings*

We begin our analysis by addressing Mr. Ryder's challenge to the denial of his request for a competency-based stay of his habeas proceedings. Mr. Ryder argues the district court erred in concluding he was competent on the date the statute of limitations ran on his habeas petition, in focusing on that date as the only relevant time for assessing competency, and in determining that none of his habeas claims would substantially benefit from his assistance.

"[T]he decision to grant a stay, like the decision to grant an evidentiary hearing, is generally left to the sound discretion of district courts." *Ryan v. Gonzales*, --- U.S. ---, 133 S. Ct. 696, 708 (2013) (internal quotation marks omitted). District courts maintain

15

this authority in the context of habeas proceedings subject to AEDPA, *id.*, but AEDPA does "circumscribe their discretion." *Rhines v. Weber*, 544 U.S. 269, 276 (2005). A stay of habeas proceedings "must therefore be compatible with AEDPA's purposes," including its goal of "reduc[ing] delays in the execution of state and federal criminal sentences, particularly in capital cases." *Id.* (internal quotation marks omitted).

## 1. The Authority to Grant a Competency-Based Stay

The Supreme Court recently addressed the propriety of a competency-based stay of habeas proceedings. *Gonzales*, 133 S. Ct. 696. In *Gonzales*, the Court reviewed the conclusion reached by two appellate courts, the Ninth and the Sixth Circuits, that habeas petitioners have a statutory right to be competent during habeas proceedings and that a petitioner's incompetence necessitates a stay of habeas proceedings. *Id.* at 700–02. On certiorari, the Supreme Court ruled, first, that no such statutory right exists. It thus rejected the Ninth Circuit's reliance on 18 U.S.C. § 3599(a)(2), which grants a habeas petitioner seeking review of a death sentence a right to counsel, and the Sixth Circuit's reliance on 18 U.S.C. § 4241, which establishes procedures for determining a federal criminal defendant's competency to stand trial. *Id.* at 702–07.

The Court next considered whether a district court may exercise its equitable powers to issue a stay of habeas proceedings in light of a petitioner's incompetence. *Id.* at 707–08. The Court observed that, despite the absence of a statutory right to competency in habeas proceedings, district courts retain the "authority to issue stays, where such a stay would be a proper exercise of discretion." *Id.* at 708 (internal quotation marks omitted). Although the Court declined to determine "the precise contours" of this

equitable authority, it instead described the "outer limits" of a district court's discretion to grant a competency-based stay of habeas proceedings. *Id.* These outer limits instruct that where a habeas petitioner raises claims that are either "record based"—i.e., were adjudicated on the merits in state court—or are "resolvable as a matter of law," a district court abuses its discretion in granting a request for a competency-based stay. *Id.* The Court reasoned that a habeas petitioner's competent participation is not necessary when the petitioner raises only claims that were adjudicated on the merits in state court because AEDPA limits the review of such claims to "the record that was before the state court." *Id.* (quoting *Cullen v. Pinholster*, 563 U.S. 170, 181 (2011)); *see also* 28 U.S.C. § 2254(d). Nor is the petitioner's participation necessary when he raises legal challenges because such challenges do not depend on the petitioner's knowledge or comprehension. *Id.*. Therefore, "any evidence that a petitioner might have would be inadmissible." *Id.* The Court also suggested that an unexhausted but procedurally barred claim would not benefit from petitioner's assistance and therefore would not provide a sufficient basis for granting a competency-based stay. *Id.* at 709.

Finally, the Court concluded that even if a habeas petitioner raises claims that are neither exhausted nor procedurally defaulted, "an indefinite stay would be inappropriate" because such a stay would undermine AEDPA's interest in finality. *Id.* Therefore, "[i]f a district court concludes that the petitioner's claim could substantially benefit from the petitioner's assistance, the district court should take into account the likelihood that the petitioner will regain competence in the foreseeable future." *Id.* If the result of such an assessment is "no reasonable hope" that the petitioner will regain competency, "a stay is

17

inappropriate and merely frustrates the State's attempts to defend its presumptively valid judgment." *Id.*

Guided by the Supreme Court's decision in *Gonzales*, we must determine whether the district court abused its discretion in denying Mr. Ryder's request for a competency-based stay. As the following discussion shows, even if the district court erred in deeming Mr. Ryder competent at the time he filed his habeas petition, the court was within its discretion in denying his request for a stay because all of his claims fall outside the outer limits of the district court's discretion.

## 2. Mr. Ryder's Habeas Claims

In his habeas petition, Mr. Ryder raised eleven claims for habeas relief. On appeal, he argues at least two of these claims would benefit from his assistance. Specifically, he relies on habeas claims one and two, the same two claims for which we granted a COA. These claims assert: (1) Mr. Ryder was incompetent to stand trial, trial counsel was ineffective in failing to raise the issue of competency prior to trial, the retrospective competency hearing violated his due process rights, and appellate counsel was ineffective at the retrospective competency hearing; and (2) trial counsel was ineffective in failing to timely raise the issue of competency and by inadequately presenting Mr. Ryder's mitigation case.[6] Mr. Ryder contends these claims depend in large part on facts outside

---

[6] Mr. Ryder has not expressly relied on his other nine habeas claims in requesting a competency-based stay. Our review of these claims demonstrates that none provide a sufficient basis for granting a stay. Of the nine additional claims, the OCCA adjudicated seven on the merits, either on direct appeal or through postconviction proceedings. *See Ryder ex rel. Ryder v. Trammell*, No. CIV-05-0024-JHP-KEW, 2013 WL 5603851, at *23, *30, *32–36, 38 (E.D. Okla. Oct. 11, 2013).

18

the record, namely, facts regarding his communications and interactions with trial and appellate counsel, his understanding of the various mental health experts' reports, and whether he knew of additional mitigation information. But the OCCA adjudicated the merits[7] of these claims either on direct appeal or postconviction review. *Ryder v. State*, No. PCD-2002-257, slip. op. at 3–15 (Okla. Crim. App. Mar. 18, 2004); *Ryder v. State*, 83 P.3d 856, 875–78 (Okla. Crim. App. 2004). They are therefore subject to the limitations 28 U.S.C. § 2254(d) imposes on the habeas record such that "any evidence [Mr. Ryder] might have would be inadmissible." *Gonzales*, 133 S. Ct. at 708. Accordingly, the district court did not abuse its discretion in denying Mr. Ryder's request for a competency-based stay.

_____

Habeas review of these claims is therefore limited to the record that was before the state court, and any additional evidence a competent Mr. Ryder might possess would be inadmissible. With respect to the remaining two habeas claims, the first asserts that Oklahoma's lethal injection protocol is unconstitutional. *Id.* at \*37. But Mr. Ryder has not suggested that facts exist outside the record that would differentiate his challenge from those which the Supreme Court rejected in *Glossip v. Gross*, 135 S. Ct. 2726, *reh'g denied*, 136 S. Ct. 20 (2015). The second remaining claim argues Mr. Ryder is incompetent to be executed, *Ryder*, 2013 WL 5603851, at \*36, which Mr. Ryder acknowledges is not ripe for review, *see Panetti v. Quarterman*, 551 U.S. 930, 945–48 (2007) (explaining that a claim of incompetency to be executed is not ripe until an execution date has been set). We are therefore satisfied that none of these claims would benefit from Mr. Ryder's competent assistance.

   [7] As we explain more fully below, the OCCA was less than thorough in its analysis of Mr. Ryder's first habeas claim. *See infra* Part III.B.1. But it nonetheless disposed of the claim on the merits, and therefore our review is limited to the record that was before the OCCA. *See Aycox v. Lytle*, 196 F.3d 1174, 1177 (10th Cir. 1999) ("Since we have an adjudication on the merits, we must consider what it means to defer to a decision which does not articulate a reasoned application of federal law to determined facts. We conclude . . . that we owe deference to the state court's *result*, even if its reasoning is not expressly stated.").

19

## B. Habeas Claims

We now address the merits of Mr. Ryder's habeas claims. Our review of these claims is circumscribed by AEDPA, which allows for habeas relief from a state court adjudication only if the petitioner can show the state court decision (1) is "contrary to, or involved an unreasonable application of, clearly established Federal law, as determined by the Supreme Court of the United States," or (2) is "based on an unreasonable determination of the facts in light of the evidence presented in the State court proceeding." 28 U.S.C. § 2254(d)(1), (2). This standard "erects a formidable barrier to federal habeas relief for prisoners whose claims have been adjudicated in state court" and requires the petitioner to show "that the state court's ruling on the claim being presented in federal court was so lacking in justification that there was an error beyond any possibility for fairminded disagreement." *Burt v. Titlow*, 134 S. Ct. 10, 16 (2013) (ellipsis and internal quotation marks omitted); *see also Frost v. Pryor*, 749 F.3d 1212, 1225 (10th Cir. 2014) ("Under the [fairminded jurists] test, if all fairminded jurists would agree the state court decision was incorrect, then it was unreasonable and the habeas corpus writ should be granted. If, however, some fairminded jurists could possibly agree with the state court decision, then it was not unreasonable and the writ should be denied."). AEDPA therefore "demands that state-court decisions be given the benefit of the doubt." *Cullen v. Pinholster*, 563 U.S. 170, 181 (2011) (internal quotation marks omitted).

A state court's legal conclusion is contrary to clearly established Supreme Court precedent under § 2254(d)(1) if it "'applies a rule that contradicts the governing law set

forth in Supreme Court cases' or 'confronts a set of facts that are materially indistinguishable from a decision of the Supreme Court and nevertheless arrives at a result different from that precedent.'" *Fairchild v. Trammell*, 784 F.3d 702, 710 (10th Cir. 2015) (brackets omitted) (quoting *Williams v. Taylor*, 529 U.S. 362, 405–06 (2000)). Likewise, "a state court decision is an unreasonable application" of Supreme Court precedent if it "'correctly identifies the governing legal rule but applies it unreasonably to the facts of a particular prisoner's case.'" *Id.* at 711 (quoting *Williams*, 529 U.S. at 407–08). In assessing whether the state court decision comports with Supreme Court precedent, we focus "on what a state court knew and did," and we measure the state court's decision "against [the Supreme] Court's precedents as of the time the state court renders its decision." *Pinholster*, 563 U.S. at 182 (internal quotation marks omitted).

Our review of a state court's factual determinations under § 2254(d)(2) is even narrower. "We may not characterize these state-court factual determinations as unreasonable merely because we would have reached a different conclusion in the first instance." *Brumfield v. Cain*, 135 S. Ct. 2269, 2277 (2015) (brackets and internal quotation marks omitted). Instead, we must accord the state court's factual findings "substantial deference." *Id.* Under this standard, if "reasonable minds reviewing the record might disagree about the finding in question," we must defer to the state court decision. *Id.* (internal quotation marks omitted). But "where the state courts plainly misapprehend or misstate the record in making their findings, and the misapprehension goes to a material factual issue that is central to petitioner's claim, that misapprehension can fatally undermine the fact-finding process, rendering the

21

resulting factual finding unreasonable." *Byrd v. Workman*, 645 F.3d 1159, 1171–72 (10th Cir. 2011). The habeas petitioner bears the burden of rebutting the state court's factual findings "by clear and convincing evidence." 28 U.S.C. § 2254(e)(1).

In determining whether the district court erred in denying Mr. Ryder's request for habeas relief, "we review the district court's legal analysis of the state court decision *de novo* and its factual findings, if any, for clear error." *Frost*, 749 F.3d at 1223 (internal quotation marks omitted).

## 1. Ineffective Assistance of Counsel at the Retrospective Competency Trial

We begin by applying this standard to Mr. Ryder's challenge to the retrospective competency trial. In his habeas petition, Mr. Ryder challenged the Oklahoma courts' competency determinations on both substantive and procedural grounds, arguing the evidence at the retrospective competency trial showed he was convicted and sentenced while incompetent and the procedures employed to assess his competency and his counsel's representation were deficient. On appeal, however, Mr. Ryder limits his competency argument to a claim of ineffective assistance of counsel at the retrospective competency trial. He argues defense counsel provided deficient performance and but for this deficient performance, the jury would have found him incompetent.

As a threshold matter, we must address Mr. Ryder's contention that we should review this ineffective-assistance-of-counsel claim de novo, instead of under AEDPA's deferential standard. Mr. Ryder argues the OCCA failed to expressly rule on this claim, even though he raised it in his application for postconviction relief. As a result, he contends that no state court decision exists to which we must defer.

22

But AEDPA's deferential standard applies not only to claims the state court squarely addressed, but also to claims it reached only cursorily. As the Supreme Court explained in *Harrington v. Richter*, "[w]here a state court's decision is unaccompanied by an explanation, the habeas petitioner's burden still must be met by showing there was no reasonable basis for the state court to deny relief." 562 U.S. 86, 98 (2011). This burden remains "whether or not the state court reveals which of the elements in a multipart claim it found insufficient, for § 2254(d) applies when a 'claim,' not a component of one, has been adjudicated." *Id.*

We have applied *Richter*'s directive to our habeas review of a prior OCCA decision. *See Williams v. Trammell*, 782 F.3d 1184 (10th Cir. 2015). In *Williams*, the OCCA failed to thoroughly analyze the petitioner's ineffective-assistance-of-counsel claim. *Id.* at 1199. We explained that although the OCCA's decision was not "a model of clarity," our task under AEDPA was "still to evaluate the reasonableness of the OCCA's application of *Strickland,* considering the reasonableness of the theories that 'could have supported' the OCCA's decision." *Id.* at 1200 (quoting *Richter*, 562 U.S. at 102). Applying this test, we concluded that the OCCA "reasonably could have" ruled that petitioner's ineffective-assistance-of-counsel claim failed. *Id.*

Here, Mr. Ryder raised a broad ineffective-assistance-of-appellate-counsel claim in his application for postconviction relief to the OCCA. As a subpart of that claim, Mr. Ryder argued appellate counsel was ineffective during the retrospective competency trial, and he requested an evidentiary hearing to more fully develop the issue. In its order denying Mr. Ryder's application for postconviction relief, the

23

OCCA broadly rejected Mr. Ryder's ineffective-assistance-of-appellate-counsel claim but did not separately discuss Mr. Ryder's challenge to counsel's representation during the retrospective competency trial. *Ryder v. State*, No. PCD-2002-257, slip op. at 16 (Okla. Crim. App. Mar. 18, 2004). The OCCA did, however, expressly deny Mr. Ryder's request for an evidentiary hearing to "develop the issue surrounding the retrospective competency trial." *Id.* at 18. Although the OCCA's rejection of this claim was "unaccompanied by an explanation," the claim was clearly presented to the OCCA and ruled on. AEDPA deference therefore still applies to our review of its decision and restrains us from granting relief unless Mr. Ryder can show "there was no reasonable basis for the state court to deny relief." *Richter*, 562 U.S. at 98; *See also Lott v. Trammell*, 705 F.3d 1167, 1213 (10th Cir. 2013) ("[A]ny denial of a request for an evidentiary hearing on the issue of ineffective assistance of counsel filed pursuant to OCCA Rule 3.11 [which permits supplementing the record on direct appeal or on postconviction] . . . operates as an adjudication on the merits of the *Strickland* claim and is therefore entitled to deference under § 2254(d)(1)."). The only exception to this deference is "if there is reason to think some other explanation for the state court's decision is more likely" than an adjudication on the merits. *Richter*, 562 U.S. at 99–100. Mr. Ryder contends another explanation exists here, namely that the OCCA applied the ineffective-assistance standard it set forth in *Walker v. State*, 933 P.2d 327 (Okla. Crim. App. 1997), which we have invalidated as contrary to *Strickland*. *Cargle v. Mullin*, 317 F.3d 1196, 1202–04 (10th Cir. 2003). But our review of the OCCA's decision convinces us it did not apply *Walker* in

24

assessing Mr. Ryder's claim that appellate counsel was ineffective during the retrospective competency trial. Instead, it applied *Walker* to claims that are not before us regarding appellate counsel's investigation prior to briefing. With respect to the claim at issue, the OCCA cited and properly applied *Strickland. Ryder*, No. PCD-2002-257, slip op. at 11–15. The OCCA's mistaken reliance on *Walker* in one part of its opinion does not invalidate the whole. Thus, because Mr. Ryder has not shown that "some other explanation" for the OCCA's decision exists, we proceed by assessing Mr. Ryder's challenges to counsel's performance at the retrospective competency trial to determine if indeed there was no reasonable basis for the OCCA's decision to reject this claim.

Mr. Ryder argues counsel provided ineffective assistance at the retrospective competency trial by (a) failing to adequately investigate his history of mental illness, (b) declining to present evidence showing his disengaged demeanor throughout his criminal trial, and (c) informing the jury at the retrospective competency trial that he had been convicted of murder and sentenced to death. To succeed on this ineffective-assistance-of-counsel claim, Mr. Ryder must prove deficient performance and prejudice. *Strickland v. Washington*, 466 U.S. 668, 687 (1984). When determining whether counsel's performance was deficient, we begin with a strong presumption that counsel "rendered adequate assistance and made all significant decisions in the exercise of reasonable professional judgment." *Id.* at 690. To overcome this presumption, Mr. Ryder must show that counsel failed to act "reasonab[ly] considering all the circumstances" and "made errors so serious that counsel was not

25

functioning as the 'counsel' guaranteed the defendant by the Sixth Amendment." *Id.* 687–88. To prove prejudice, Mr. Ryder must show "there is a reasonable probability that, but for counsel's unprofessional errors, the result of the proceeding would have been different." *Id.* at 694. "A reasonable probability is a probability sufficient to undermine confidence in the outcome." *Id.*

Adding the extra layer of AEDPA deference, Mr. Ryder must show that "the state court's application of the *Strickland* standard was unreasonable." *Richter*, 562 U.S. at 101. Because the OCCA failed to articulate its basis for rejecting this ineffective-assistance-of-counsel claim, our task is to "determine what arguments or theories supported or . . . could have supported, the state court's decision." *Id.* at 102. We must affirm the state court decision if "it is possible fairminded jurists could disagree that those arguments or theories are inconsistent with the holding in a prior decision of [the Supreme Court]." *Id.* Thus, our review of Mr. Ryder's ineffective-assistance-of-counsel claims is "doubly deferential" in that "we take a highly deferential look at counsel's performance [under *Strickland*] through the deferential lens of § 2254(d)." *Pinholster*, 563 U.S. at 190 (citations and internal quotation marks omitted); *see also Richter*, 562 U.S. at 105 (explaining that under this double deference, "[t]he question is whether there is any reasonable argument that counsel satisfied *Strickland*'s deferential standard"). As the following analysis explains, none of Mr. Ryder's challenges to counsel's performance at the retrospective competency trial overcomes this sizeable hurdle.

26

*a. Investigation into Mr. Ryder's mental health history*

Mr. Ryder argues, first, that appellate counsel was ineffective for inadequately investigating his personal and family history of mental illness and his mental health symptoms in preparation for the retrospective competency trial. In so arguing, Mr. Ryder relies primarily on appellate counsel's affidavit submitted to the OCCA with his application for postconviction relief. In that affidavit, counsel stated he "did not conduct any investigation into any extra-record issues."

Although a complete failure to investigate Mr. Ryder's background could demonstrate deficient performance, *see Williams v. Taylor*, 529 U.S. 362, 394–96 (2000), the record here does not support Mr. Ryder's contention that counsel's investigation was completely lacking. The affidavit upon which Mr. Ryder relies does not indicate that counsel failed to conduct any investigation into Mr. Ryder's personal and family history of mental illness, but rather that counsel chose not to investigate any "extra-record issues." The affidavit goes on to explain that in preparation for Mr. Ryder's appeal and retrospective competency proceedings, counsel reviewed the trial records and transcripts, spoke with Mr. Ryder's parents on more than one occasion, and was present at a competency evaluation the State had requested. The affidavit of Mr. Ryder's mother, Sue Ryder, also states that, prior to the competency proceedings, Mr. Ryder's counsel visited her in Georgia and interviewed her and other family members.

The transcript from the retrospective competency trial likewise demonstrates that counsel conducted an investigation into Mr. Ryder's mental health history.

27

Dr. Montgomery testified that before he reevaluated Mr. Ryder in anticipation of the competency proceedings, Mr. Ryder's counsel provided him with additional records to which he did not have access when he initially evaluated Mr. Ryder in 2000. Dr. Montgomery further testified that based on that additional information provided by defense counsel, he was able to make a more reliable diagnosis and to conclude that Mr. Ryder suffered from a delusional disorder under the schizophrenic group of disorders. And contrary to Mr. Ryder's position that Dr. Montgomery was unprepared to testify about his delusional symptoms due to counsel's inadequate investigation, the trial transcripts reveal that Dr. Montgomery did, in fact, testify that Mr. Ryder suffered from grandiose delusional beliefs including an obsession with going to the Yukon to survive an approaching apocalypse.

Because the record demonstrates that counsel conducted an investigation into Mr. Ryder's mental health history and symptoms, we cannot say that there was no reasonable basis for the OCCA to deny relief on this issue.

### b. *Investigation and presentation of evidence regarding Mr. Ryder's trial demeanor*

Mr. Ryder next claims counsel was ineffective in failing to investigate and present evidence at the retrospective competency trial that could have rebutted Judge Bartheld's testimony. He argues counsel could have called various witnesses who observed Mr. Ryder's demeanor during his criminal trial and who would have testified, contrary to Judge Bartheld's testimony, that Mr. Ryder appeared distant and disengaged. Specifically, Mr. Ryder relies on the affidavits of several sitting and alternate jurors, each

28

of whom stated that Mr. Ryder did not make eye contact with his attorneys and appeared uninterested and expressionless throughout his trial. Mr. Ryder also points to his mother's and brother's affidavits, which indicated that Mr. Ryder was in "a preaching mode" during one break in his criminal trial and at another time his eyes were "hollow and glazed over" and his speech was incoherent. Mr. Ryder's mother also averred that Mr. Ryder seemed not to understand what was taking place in the courtroom. She further stated that had appellate counsel asked her to testify at the retrospective competency hearing, she would have.

Respondent, Warden Warrior, contends it was a reasonable strategy for counsel to rely solely on Dr. Montgomery's testimony. Respondent argues that Judge Bartheld's testimony would have easily rebutted any lay witness testimony Mr. Ryder might have offered. Specifically, Respondent relies on Judge Bartheld's testimony indicating Mr. Ryder appeared engaged throughout the criminal proceedings and coherently responded to questioning during the extensive colloquy with the court about his decision to waive his right to present mitigation evidence.

But Mr. Ryder argues counsel could not have made a strategic choice to exclude lay testimony because counsel never investigated the possibility of presenting such evidence in the first instance. He contends that, although "strategic choices made after thorough investigation of law and facts relevant to plausible options are virtually unchallengeable," *Anderson v. Sirmons*, 476 F.3d 1131, 1145 (10th Cir. 2007) (quoting *Strickland*, 466 U.S. at 690), the question here is not whether counsel made a strategic

29

choice but whether "the investigation supporting counsel's decision . . . *was itself reasonable*," *id.* (quoting *Wiggins v. Smith*, 539 U.S. 510, 523 (2003)).

We agree with Mr. Ryder that if counsel completely failed to investigate the possibility of presenting lay witnesses at the retrospective competency trial, such a failure could amount to deficient performance. But we are not convinced that all fairminded jurists would conclude that counsel's investigation was inadequate. First, as to counsel's investigation into the possibility of having Mr. Ryder's family testify, as previously explained, the record demonstrates counsel interviewed Mr. Ryder's family on at least two separate occasions before the retrospective competency trial. Based on these interviews, counsel could have made the strategic choice that the testimony from Mr. Ryder's family would not have been sufficient to rebut Judge Bartheld's testimony regarding Mr. Ryder's competency at trial.

Second, although the record suggests appellate counsel did not interview the jurors from Mr. Ryder's criminal trial or otherwise pursue lay testimony about Mr. Ryder's trial demeanor, reasonable jurists could conclude that counsel was not ineffective for failing to do so. In preparing for the retrospective competency trial, counsel's charge was to investigate possible theories that could show Mr. Ryder was legally incompetent. The test for legal competency instructs that "[a] defendant may not be put to trial unless he has sufficient present ability to consult with his lawyer with a reasonable degree of rational understanding and a rational as well as factual understanding of the proceedings against him." *Cooper v. Oklahoma*, 517 U.S. 348, 354 (1996) (alterations and internal quotation marks omitted). Observations from criminal-trial jurors regarding Mr. Ryder's demeanor

30

during his criminal trial would provide little, if any, evidence as to whether Mr. Ryder had a sufficient ability to consult with his attorneys or a rational understanding of the nature of the proceedings against him. Although such testimony may have supported an inference that Mr. Ryder was suffering from a mental health condition, "[t]hat a defendant suffers from some degree of mental illness or disorder does not necessarily mean that he is incompetent to assist in his own defense." *United States v. DeShazer*, 554 F.3d 1281, 1286 (10th Cir. 2009). Indeed, the jurors' testimony would have done little to undermine Judge Bartheld's testimony about his colloquy with Mr. Ryder, during which Mr. Ryder attested that he knew he had been convicted of first-degree murder, that he faced the possibility of being sentenced to death, and that he would rather die than spend his life in prison.

Under these circumstances, fairminded jurists could conclude that counsel made a reasonable strategic choice to forego investigating witnesses who could merely describe Mr. Ryder's countenance and instead to focus on presenting expert testimony that could counteract Judge Bartheld's testimony with a medical diagnosis of Mr. Ryder's mental disorder. We therefore cannot conclude this claim overcomes the double deference we afford to counsel and the state court under AEDPA.

Moreover, even if Mr. Ryder could satisfy his burden of showing deficient performance under our doubly deferential standard, he has not shown prejudice. First, fairminded jurists could conclude that Judge Bartheld's testimony was sufficient to rebut the testimony from the jurors and Mr. Ryder's family, even if such testimony had been presented. Second, even if Mr. Ryder suffered from some mental disorder that manifested

31

itself in the manner described by the jurors and Mr. Ryder's mother, fairminded jurists could conclude that Mr. Ryder nevertheless met the legal standard of competency. *See Cooper,* 517 U.S. at 354. Judge Bartheld provided compelling testimony that Mr. Ryder was able to engage in an extensive colloquy and that he understood the nature of the proceedings, could communicate his instructions to counsel, and was aware of the likely consequences. Because fairminded jurists could conclude that the outcome of Mr. Ryder's retrospective competency trial would not have been different, had counsel investigated and presented the testimony of lay witnesses, we must affirm the district court's rejection of this claim.

> c. *Decision to inform the jury of Mr. Ryder's conviction and sentence*

Finally, Mr. Ryder contends counsel rendered ineffective assistance by informing the retrospective competency jury that he had been convicted of murder and sentenced to death. He argues this information was irrelevant to the issue of competency, prejudicial, and contrary to Oklahoma law. *See Lambert v. State*, 71 P.3d 30, 31 (Okla. Crim. App. 2003) (instructing that a jury determining defendant's mental capacity in a remanded case "should not hear evidence on the crimes for which [defendant] was convicted, unless particular facts of the case are relevant to the issue of mental retardation") (*superseded by statute on other grounds as stated in Murphy v. State*, 281 P.3d 1283, 1289 (Okla. Crim. App. 2012)).

Although this information raises concerns of prejudice, we are not convinced counsel's decision to reveal it during voir dire was deficient "beyond any possibility for fairminded disagreement." *Richter*, 562 U.S. at 103. A key component of the evidence of

32

Mr. Ryder's alleged incompetence was his refusal to allow counsel to present any mitigation evidence at sentencing. For the defense to explain the significance of that decision and why it reflected on Mr. Ryder's competence, the jury would need to know Mr. Ryder was facing a death sentence. Because Mr. Ryder's conviction and sentence were so intertwined with evidence relevant to his competency, we cannot conclude counsel acted unreasonably in raising this information during voir dire, when counsel could assess its impact on the prospective jurors' ability to render an impartial decision on Mr. Ryder's competency.

In sum, Mr. Ryder has failed to demonstrate there was no reasonable basis for the OCCA to deny relief on his claim that counsel was ineffective at the retrospective competency trial. Nor has he proven that the OCCA's decision was contrary to or constituted an unreasonable application of *Strickland* or its progeny. And because Mr. Ryder has raised no other challenges to the retrospective competency trial, we must defer to the OCCA's decision affirming that Mr. Ryder was competent to stand trial. *See Bryan v. Gibson*, 276 F.3d 1163, 1170 (10th Cir. 2001) ("We must presume the jury's competency finding is correct, absent clear and convincing evidence that [petitioner] was in fact incompetent at the time of his trial.") (citations and footnote omitted), *rev'd in part on other grounds sub nom. Bryan v. Mullin*, 335 F.3d 1207 (10th Cir. 2003) (en banc); *Ryder v. State*, 83 P.3d 856, 870 (Okla. Crim. App. 2004) ("Any rational trier of fact could have found from the evidence presented that [Mr. Ryder] had not proven his incompetence by a preponderance of the evidence.").

## 2. Ineffective Assistance of Trial Counsel

In his second claim for habeas relief, Mr. Ryder argues trial counsel failed to adequately investigate and raise his mental illness and background as they related to his competency to stand trial and as mitigation evidence. He therefore contends he was deprived of his right to effective assistance of counsel. Before assessing the merits of this claim, we address its complicated procedural posture.

### a. Procedural posture

Mr. Ryder first raised an ineffective-assistance-of-trial-counsel claim in his direct appeal to the OCCA. He argued on direct appeal that trial counsel had been ineffective for failing to timely raise the issue of competency and was rendered ineffective in the penalty phase when the trial court allowed Mr. Ryder to prohibit counsel from presenting a full mitigation case. The OCCA rejected both claims on their merits. *Ryder*, 83 P.3d at 875–78.

In his application for postconviction relief to the OCCA, Mr. Ryder again argued trial counsel was ineffective. This time, he asserted his incompetency rendered counsel's investigation into and presentation of his mitigation case ineffective. Mr. Ryder further asserted appellate counsel had been ineffective for failing to raise this claim on direct appeal. In rejecting this claim on postconviction review, the OCCA ruled, first, that the claim "ha[d] been raised previously" on direct appeal and therefore further consideration was barred under principles of res judicata. *Ryder*, No. PCD-2002-257, slip op. at 6. But, the OCCA continued, to the extent Mr. Ryder's argument on postconviction differed from his appellate argument, the claim was waived. *Id.* at 6–7; s*ee also* Okla. Stat. tit. 22,

34

§ 1089(D)(4) (barring claims that could have been raised on direct appeal from being raised in an application for postconviction relief). As for Mr. Ryder's argument that appellate counsel was ineffective for not raising this claim, the OCCA ruled that because Mr. Ryder's ineffective-assistance-of-trial counsel claim failed on its merits, appellate counsel could not have been ineffective even if it had failed to raise the claim. *Ryder*, No. PCD-2002-257, slip op. at 9–15. Therefore, even though the OCCA determined that this claim was barred either due to principles of res judicata or procedural default, the court ultimately assessed the merits of the claim in order to determine whether appellate counsel had been ineffective for failing to raise it.

Because the OCCA reached the merits of Mr. Ryder's ineffective-assistance-of-trial counsel claim on both direct appeal and postconviction review, we must apply AEDPA deference to those merits adjudications.

*b. Cause and Prejudice*

Assuming, as did the OCCA, that Mr. Ryder did not raise this precise rendition of his ineffective-assistance-of-trial-counsel claim on direct appeal, he must demonstrate cause and prejudice to excuse his procedural default. *Maples v. Thomas*, 132 S. Ct. 912, 922 (2012). During postconviction proceedings before the OCCA, Mr. Ryder argued, as he does now, that appellate counsel's ineffectiveness in failing to raise the argument demonstrates cause and prejudice. *Ryder*, No. PCD-2002-257, slip op. at 6 ("[Mr. Ryder] argues [his trial counsel ineffectiveness claim] is not procedurally barred due to appellate counsel's ineffectiveness in failing to raise the issue."). The OCCA analyzed this claim

and concluded appellate counsel had not been ineffective under *Strickland* because the ineffective-assistance-of-trial-counsel claim lacked merit. *Id.* at 15.

When a state court analyzes appellate counsel ineffectiveness as an excuse for procedural default, we must afford AEDPA deference to that analysis. *Turrentine v. Mullin*, 390 F.3d 1181, 1202 (10th Cir. 2004) (noting that the state court had already addressed petitioner's claim of ineffective assistance of appellate counsel as a basis to avoid a procedural bar and thus ruling that AEDPA "confines our review to the question of whether the OCCA's decision was contrary to or involved an unreasonable application of *Strickland*"). Despite clear circuit precedent dictating that we defer to the OCCA's analysis of this claim, Mr. Ryder contends the Supreme Court's decision in *Martinez v. Ryan*, 132 S. Ct. 1309 (2012), supersedes this authority. But *Martinez* does not address this issue. There, the Supreme Court interpreted 28 U.S.C. § 2254(i), which forbids habeas petitioners from using ineffectiveness of postconviction counsel as "a ground for relief." 132 S. Ct. at 1320. The Court found this language did not prohibit a petitioner from using postconviction ineffectiveness as cause and prejudice to excuse a default because "'[c]ause' . . . is not synonymous with 'a ground for relief.'" *Id*.

Because *Martinez* addressed only what constitutes "a ground for relief," it has no bearing on our ruling in *Turrentine* regarding application of AEDPA deference to a state court's cause-and-prejudice analysis. Rather, we are guided by other Supreme Court precedent that explains the principles AEDPA deference is intended to further. These principles include comity and federalism, respect for state judicial processes, giving

effect to state convictions to the extent possible under the law, and finality. *Woodford v. Garceau*, 538 U.S. 202, 206 (2003).

With these principles in mind, we now analyze Mr. Ryder's argument that appellate counsel's ineffectiveness in failing to raise this claim of trial counsel ineffectiveness demonstrates cause and prejudice to overcome the procedural bar. A claim of ineffective assistance of appellate counsel can serve as cause and prejudice to overcome a procedural bar, if it has merit. *See Murray v. Carrier*, 477 U.S. 478, 489–90 (1986). To assess the merits of Mr. Ryder's ineffective-assistance-of-appellate-counsel claim, we first examine the merits of the issue appellate counsel failed to raise. *Hawkins v. Hannigan*, 185 F.3d 1146, 1152 (10th Cir. 1999). "If the omitted issue is meritless, then counsel's failure to raise it does not amount to constitutionally ineffective assistance." *Id.*[8]

### c. Merits

Turning to the merits of the underlying claim—that is, ineffective assistance of trial counsel—Mr. Ryder asserts, first, that trial counsel's failure to adequately

---

[8] In addition to arguing the merits of his ineffective-assistance-of-appellate-counsel claim, Mr. Ryder insists we should grant relief because, in assessing this claim, the OCCA relied in part on *Walker v. State*, 933 P.2d 327 (Okla. Crim. App. 1997). As we explained earlier, the OCCA relied on *Walker* only in assessing Mr. Ryder's claim that appellate counsel conducted an inadequate investigation prior to briefing. In assessing whether appellate counsel was ineffective for failing to raise trial counsel's ineffective investigation and presentation of mitigating evidence, the OCCA did not rely on *Walker* but instead assessed the merits of Mr. Ryder's underlying ineffective assistance of trial counsel claim under *Strickland. Ryder v. State*, No. PCD-2002-257, slip op. at 11–15 (Okla. Crim. App. Mar. 18, 2004). We are therefore unpersuaded that the OCCA's reliance on *Walker* in a different section of its postconviction decision provides grounds for granting habeas relief on this claim.

investigate his mental health and background resulted in counsel failing to timely raise the issue of competency. Because we have already affirmed the outcome of the retrospective competency trial and therefore must defer to the OCCA's ruling that Mr. Ryder was competent to stand trial, this claim is now moot. In other words, trial counsel could not have been ineffective in failing to argue incompetency during the guilt phase of his criminal trial because, based on our deference to the OCCA's competency determination, we must assume Mr. Ryder was, in fact, competent. Therefore, trial counsel's investigation into and presentation of Mr. Ryder's mental illness is only relevant to whether counsel rendered ineffective assistance during the penalty phase of his criminal trial, and our analysis proceeds accordingly.

Mr. Ryder argues counsel failed to put forward evidence regarding his mental health and troubled past, which were critical elements of his mitigation case. "Mitigating evidence plays an overwhelmingly important role in the just imposition of the death penalty." *Romano v. Gibson*, 239 F.3d 1156, 1180 (10th Cir. 2001) (internal quotation marks omitted). Because of the importance of mitigating evidence, "counsel has a duty to pursue leads indicating a defendant's troubled background," including defendant's mental health history. *United States v. Barrett*, 797 F.3d 1207, 1223 (10th Cir. 2015). But, in certain circumstances, a defendant's actions may alter or eliminate counsel's penalty-phase obligations. We confronted just such a situation in *Wallace v. Ward*, 191 F.3d 1235 (10th Cir. 1999) *holding modified on other grounds by McGregor v. Gibson*, 248 F.3d 946, 953–54 (10th Cir. 2001). In *Wallace*, we reviewed an Oklahoma death row inmate's habeas petition, which alleged trial

counsel was ineffective for failing to present mitigating evidence at sentencing. *Id.* at 1239. During the penalty phase of his criminal trial, petitioner "took the stand himself and requested that the trial court impose the death penalty." *Id.* at 1240.

On appeal, we explained that although counsel's performance during the penalty phase is critical in a capital case, "[f]ailure to present mitigating evidence is not per se ineffective assistance of counsel." *Id.* at 1247. Instead, courts must look to counsel's reasons for not presenting available mitigating evidence and must take into account that "[t]he reasonableness of counsel's actions may be determined or substantially influenced by the defendant's own statements and actions." *Id.* (quoting *Strickland*, 466 U.S. at 691). We therefore concluded that petitioner had failed to show counsel's performance was deficient because "counsel's decision not to investigate or present mitigating evidence was completely determined by petitioner and was within the realm of reasonable tactical decisions." *Id.* at 1248; *see also Tyler v. Mitchell*, 416 F.3d 500, 504 (6th Cir. 2005) ("[T]he Constitution does not prohibit a competent capital defendant from waiving the presentation of mitigation evidence."); *Singleton v. Lockhart*, 962 F.2d 1315, 1321 (8th Cir. 1992) (ruling that in the face of a defendant's waiver of mitigating evidence, defense counsel "was under no duty" to present a mitigation case).

The Supreme Court addressed a similar issue in *Schriro v. Landrigan*, 550 U.S. 465 (2007). During the penalty phase of the defendant's criminal trial in *Landrigan,* defendant prohibited his family members from testifying on his behalf, told the trial judge there was no relevant mitigating evidence, and interfered with

39

counsel's efforts to present mitigating evidence in open court. *Id.*at 475–77. On appeal from the denial of federal habeas relief, an en banc panel of the Ninth Circuit ruled the district court abused its discretion in denying petitioner's request for an evidentiary hearing to determine whether trial counsel was ineffective during the penalty phase. *Id.* at 472. The Supreme Court granted certiorari and reversed the court of appeals. The Court ruled it was "not objectively unreasonable" for the state court "to conclude that a defendant who refused to allow the presentation of any mitigating evidence could not establish *Strickland* prejudice based on his counsel's failure to investigate further possible mitigating evidence." *Id.* at 478. The Court thus concluded that petitioner's ineffective-assistance-of-counsel claim failed and an evidentiary hearing was not warranted.

In this case, Mr. Ryder's trial counsel informed the court at the beginning of the penalty phase that Mr. Ryder refused to assist in preparing his mitigation case and had instructed counsel not to present any mitigating evidence. The trial court then engaged in a colloquy with Mr. Ryder to determine whether he wished to waive his mitigation case and whether he was competent to do so. During this colloquy, Mr. Ryder expressed that he would rather die than receive life in prison without the possibility of parole and that he therefore did not want to put on any mitigation evidence. The court also ascertained that Mr. Ryder understood he had a right to present mitigating evidence and that failing to present such evidence would likely result in the jury sentencing him to death. The court thus concluded that Mr. Ryder had knowingly and voluntarily waived his right to present mitigation evidence.

40

In his briefing to this court, Mr. Ryder insists he did not waive his entire mitigation case, but merely waived his right to be present during the penalty phase, as evidenced by the fact that the district court ultimately permitted defense counsel to put on a limited mitigation case outside of Mr. Ryder's presence. The record, however, belies this argument. As the trial transcript reveals, the trial court expressly informed Mr. Ryder that instead of waiving his mitigation rights entirely, he could simply waive his right to be present during the penalty phase. But Mr. Ryder responded, "No, I want to be here. I don't want—I don't want no second stage. I don't want no evidence." Although the record also indicates the trial court allowed defense counsel to put on two mitigation witnesses, it did so not because Mr. Ryder acquiesced, but because defense counsel sought leave to do so despite Mr. Ryder's waiver. Although defense counsel believed they were still under a constitutional and ethical obligation to present some mitigation evidence, once a capital defendant waives the right to present mitigating evidence, counsel cannot be deemed ineffective for complying with that waiver. *Wallace*, 191 F.3d at 1247–48. Where Mr. Ryder waived his right to present mitigating evidence, trial counsel was not ineffective for doing more than was then required. And because Mr. Ryder's claim of ineffective assistance of trial counsel is meritless, his claim that appellate counsel was ineffective for failing to raise the issue likewise fails. Thus, Mr. Ryder has not shown cause to overcome any procedural bar to this claim.

We acknowledge the tragic reality in this case: that Mr. Ryder's untreated mental illness may have influenced his decision to withhold mitigating evidence from the jury. Thus, the condition responsible for Mr. Ryder's unwillingness to present mitigating

evidence could have been the very evidence that would have persuaded the jury not to impose the death penalty. *See United States v. Barrett*, 797 F.3d 1207, 1231 (10th Cir. 2015) ("[E]vidence of mental impairments is exactly the sort of evidence that garners the most sympathy from jurors." (internal quotation marks omitted)). But at the time Mr. Ryder made his decision to waive his mitigation case, his mental health had not yet deteriorated to the point where he was no longer legally competent to make that decision. Or at least we must presume that he was legally competent based on our deference to the state court's retrospective competency determination. Therefore, while we recognize the existence of compelling mitigating evidence that the jury never heard, controlling precedent and the narrowness of review permitted under ADEPA dictate that we must affirm the district court's denial of habeas relief on this claim.

## IV.    CONCLUSION

For the reasons explained above, we AFFIRM the judgment of the district court denying Mr. Ryder's petition for habeas relief.