**FILED**
**United States Court of Appeals**
**Tenth Circuit**

**June 6, 2016**

**Elisabeth A. Shumaker**
**Clerk of Court**

**PUBLISH**

**UNITED STATES COURT OF APPEALS**

**FOR THE TENTH CIRCUIT**
_____

MICHAEL DEWAYNE SMITH,

    Petitioner - Appellant,

v.

KEVIN DUCKWORTH,[*] Interim Warden,
Oklahoma State Penitentiary,

    Respondent - Appellee.

No. 14-6201

_____

**Appeal from the United States District Court**
**for the Western District of Oklahoma**
**(D.C. No. 5:09-CV-00293-D)**
_____

Emma V. Rolls, Assistant Public Defender (Patti Palmer Ghezzi, Assistant Federal Public Defender, with her on the briefs), Office of the Public Defender, Oklahoma City, Oklahoma, for Petitioner-Appellant.

Thomas Lee Tucker (E. Scott Pruitt, Attorney General of Oklahoma, and Robert Whittaker, Assistant Attorney General on the brief), Office of the Attorney General for the State of Oklahoma, Oklahoma City, Oklahoma, for Respondent-Appellee.
_____

Before **BRISCOE**, **HOLMES**, and **McHUGH**, Circuit Judges.
_____

**McHUGH**, Circuit Judge.
_____

[*] Pursuant to Fed. R. App. P. 43(c)(2), Kevin Duckworth, who was appointed Interim Warden of the Oklahoma State Penitentiary on May 9, 2016, is automatically substituted for Anita Trammell as Respondent in this case.

# I.    INTRODUCTION

Michael DeWayne Smith was charged with two counts of murder for the killings of Sarath Pulluru and Janet Moore. He was convicted and sentenced to death. The Oklahoma Court of Criminal Appeals affirmed his convictions on direct appeal and denied his two applications for postconviction relief. Mr. Smith sought a writ of habeas corpus in federal district court, arguing, as relevant here, that he is ineligible for the death penalty because he is intellectually disabled, that the state trial court had erred in admitting Mr. Smith's videotaped confession to the murders at trial, that his trial counsel had rendered ineffective assistance in the presentation of his mitigation case, and that cumulative error rendered his trial unfair.[1] The district court denied habeas relief, and Mr. Smith appealed.

We granted Mr. Smith's request for a certificate of appealability on these four issues, and we now affirm the district court's judgment. Mr. Smith has failed to demonstrate that the Oklahoma Court of Criminal Appeals' rejection of his claims was contrary to or involved an unreasonable application of clearly established federal law. Thus, applying the deferential standard mandated by the Antiterrorism and Effective Death Penalty Act, we affirm the district court's denial of habeas relief.

---

[1] Because the scope of our review is limited to the four issues on which we granted a certificate of appealability, we do not discuss other claims Mr. Smith raised in the state proceedings or in the district court.

## II. BACKGROUND

### A. *Factual Background* [2]

Petitioner Michael DeWayne Smith is a member of the Oak Grove Posse (OGP), a subset of the Crips gang that operates in Oklahoma City. In November 2000, Teron "T-Nok" Armstrong and two other members of the OGP attempted to rob Tran's Food Mart in south Oklahoma City. The store owner shot and killed Mr. Armstrong. Mr. Smith was not involved in the robbery but had "close personal ties" to Mr. Armstrong. *Smith v. State* (*Smith I*), 157 P.3d 1155, 1161 (Okla. Crim. App. 2007).

The other two would-be robbers were later arrested and were set to be tried for the robbery in February 2002. Two days before the trial, Mr. Smith, armed with a .357 revolver, went to the apartment of Janet Moore. Believing Ms. Moore's son was a police informant, Mr. Smith kicked in her door and confronted her. When she began to scream, Mr. Smith shot her to death. Before leaving, Mr. Smith wiped down the apartment to eliminate any fingerprint evidence.

Mr. Smith next went to the A-Z Mart, a convenience store "immediately next door" to Tran's Food Mart—the site of the earlier failed robbery attempt. *Id.* at 1161. Mr. Smith "emptied two pistols into" the clerk on duty, Sarath Pulluru, took money

---

[2] This summary of the facts is based principally on the Oklahoma Court of Criminal Appeals' recitation of the facts in Mr. Smith's direct appeal. *See generally Smith v. State* (*Smith I*), 157 P.3d 1155 (Okla. Crim. App. 2007). We presume a state court's factual findings to be correct unless the petitioner rebuts that presumption by "clear and convincing evidence." 28 U.S.C. § 2254(e)(1). Mr. Smith has not done so here.

from the register, and then used lighter fluid to set fires around the store. *Id.* He set fire to Mr. Pulluru's body and "whatever he had touched in the A-Z Mart to destroy evidence." *Id.* at 1162. Afterward he disposed of the clothes he had worn during the murders.

Mr. Smith returned home early the next morning and reported to his roommate that he had killed Janet Moore, had "done something else to 'take care of business,'" and had "avenged his family." *Id.* at 1161. A couple of hours later, Mr. Smith went to the home of Sheena Johnson. He told her that he had killed Ms. Moore because her son had been "snitching" and that he had "killed a person at a 'chink' store" because someone connected to the A-Z Mart "had been on television 'dissing' his set" in response to the earlier attempted robbery. *Id.* Ms. Johnson later reported this conversation to police, who had already taken Mr. Smith into custody on a different matter.

Three days after Mr. Smith was arrested, detectives interviewed him about the killings. He signed a written waiver of his *Miranda* rights[3] and agreed to talk to the detectives. After initially denying his involvement, Mr. Smith admitted to both murders, explaining that he "killed both victims in retaliation for wrongs done him or his family." *Id.* He explained that he went to Ms. Moore's apartment looking for her son but ended up killing her when she "panicked and started screaming." *Id.* And he

---

[3] Under *Miranda v. Arizona*, a suspect in custody must be informed of his rights to refuse to answer questions or to have retained or appointed counsel present during questioning. 384 U.S. 436, 445 (1966).

stated that he killed Mr. Pulluru "in retaliation against the store owner who shot Armstrong and in retaliation for disrespectful comments about Armstrong in the press attributed to someone from the A-Z Mart." *Id.* He further admitted that he had disposed of the clothes he wore during the murders, wiped down Ms. Moore's apartment to eliminate fingerprints, and set fires in the A-Z Mart to destroy evidence. Mr. Smith's confession was videotaped.

### B. *Procedural Background*

**1. Trial and Direct Appeal**

The State of Oklahoma charged Mr. Smith with two counts of murder, burglary, robbery with a firearm, and arson. The state trial court held a pretrial hearing to determine the validity of Mr. Smith's *Miranda* waiver and the admissibility of Mr. Smith's videotaped confession. At the hearing, Mr. Smith put on evidence that he was "a long term PCP user" and admitted to being under the influence of PCP at the time of his arrest. *Id.* at 1171. An expert witness testified for the defense and opined that Mr. Smith could have still been under the influence of PCP at the time of his interrogation conducted three days after his arrest. Mr. Smith also sought to elicit testimony regarding his low intelligence and information processing deficits from Dr. Faust Bianco, a neuropsychologist. Mr. Smith proffered Dr. Bianco's opinion that Mr. Smith's "functioning at a borderline or low average [IQ] range with deficiencies in the information processing speed and the influence of the chronic and current PCP use would affect his ability to understand the *Miranda*

5

warnings and more importantly to understand the consequences of waiving those warnings."

The trial court rejected the offer of proof, stating that "there are many indicia[] demonstrat[ing] that this Defendant possessed intelligence" and "demonstrated in many different ways his understanding of what was going on." The trial court reasoned that "testimony regarding [Mr. Smith's] specific IQ range would [not] be relevant" and excluded Dr. Bianco's testimony. Relying on its own observations of Mr. Smith's demeanor over the course of the two-hour recorded interview, the trial court concluded that Mr. Smith had knowingly and voluntarily waived his *Miranda* rights and that his videotaped confession was therefore admissible.

The case proceeded to trial, and the jury returned a guilty verdict on all five counts. In the penalty phase for Mr. Smith's murder convictions, the State sought to prove two aggravating circumstances: (1) that "each murder was especially heinous, atrocious or cruel," and (2) that "there existed a probability that Smith would commit future acts of violence constituting a continuing threat to society." *Id.* at 1160 & n.1. Defense counsel presented a mitigation defense centered on Mr. Smith's inability to cope with his father's death, leading to his increased involvement with gangs. The jury found both aggravating circumstances for each killing and fixed Mr. Smith's punishment as death for each count. The trial court accordingly sentenced Mr. Smith to death.

Mr. Smith appealed, arguing his waiver of *Miranda* rights was invalid because the trial court refused to receive evidence of his low intelligence in evaluating the

6

validity of that waiver. The Oklahoma Court of Criminal Appeals (the OCCA) rejected that claim and affirmed Mr. Smith's conviction and sentence on direct appeal. *Id.* at 1171–72, 1180. Mr. Smith petitioned the United States Supreme Court for a writ of certiorari, which the Court denied. *Smith v. Oklahoma*, 552 U.S. 1191 (2008).

## 2. Postconviction Proceedings

Mr. Smith next filed his first Application for Post-Conviction Relief with the OCCA. He argued that his trial counsel rendered ineffective assistance in the penalty phase by failing to fully investigate and present evidence of his family and social history, including evidence of harsh discipline or physical abuse, early and consistent exposure to drugs, and childhood head injuries. The OCCA denied relief in an unpublished order.

Mr. Smith then petitioned the federal district court for a writ of habeas corpus under 28 U.S.C. § 2254. In that petition, Mr. Smith argued he was intellectually disabled and therefore ineligible for the death penalty under *Atkins v. Virginia*,[4] the OCCA had unreasonably determined that his *Miranda* waiver was valid, and his trial counsel had rendered ineffective assistance in the mitigation phase by failing to present evidence of his troubled upbringing, intellectual disability, and substance abuse. With his habeas petition pending in federal court, Mr. Smith filed a second

---

[4] As discussed in more detail below, the Supreme Court held in *Atkins v. Virginia* that execution of intellectually disabled defendants violates the Eighth Amendment's bar on cruel and unusual punishment. 536 U.S. 304, 321 (2002).

7

Application for Post-Conviction Relief with the OCCA, seeking to exhaust his *Atkins* claim and his ineffective-assistance claim based on failure to present intellectual-disability and substance-abuse evidence. The OCCA denied this second application in a published decision, *Smith v. State* (*Smith II*), 245 P.3d 1233 (Okla. Crim. App. 2010).

Mr. Smith then returned to federal court and sought adjudication of his habeas petition. The district court denied relief, ruling that Mr. Smith was not intellectually disabled and had not shown the OCCA's decisions with respect to his *Miranda* waiver or ineffective-assistance claim were contrary to or an unreasonable application of clearly established federal law. The district court denied a certificate of appealability (COA) on all issues.

Mr. Smith then sought a COA from this court, which we granted on four issues: Mr. Smith's intellectual-disability claim, his challenge to the exclusion of Dr. Bianco's testimony concerning the validity of his *Miranda* waiver, his claim of ineffective assistance of counsel in the penalty phase, and cumulative error.

## III.  DISCUSSION

Federal habeas corpus review of a state prisoner's conviction and sentence is circumscribed by the provisions of the Antiterrorism and Effective Death Penalty Act of 1996 (AEDPA). Under AEDPA, a habeas petitioner is not entitled to relief on a claim that has been adjudicated in state court unless "the state court's resolution of his claims was 'contrary to, or involved an unreasonable application of, clearly established Federal law, as determined by the Supreme Court of the United States' or

8

'was based on an unreasonable determination of the facts in light of the evidence presented in the State court proceeding.'" *Hooks v. Workman*, 689 F.3d 1148, 1163 (10th Cir. 2012) (quoting 28 U.S.C. § 2254(d)(1), (2)). AEDPA thus "erects a formidable barrier to federal habeas relief for prisoners whose claims have been adjudicated in state court" and "requires a state prisoner [to] show that the state court's ruling on the claim being presented in federal court was so lacking in justification that there was an error . . . beyond any possibility for fairminded disagreement." *Burt v. Titlow*, 134 S. Ct. 10, 16 (2013) (alteration and omission in original) (internal quotation marks omitted). But if "some fairminded jurists could possibly agree with the state court decision, then it was not unreasonable and the writ should be denied." *Frost v. Pryor*, 749 F.3d 1212, 1225 (10th Cir. 2014).

A state-court decision is contrary to clearly established federal law under 28 U.S.C. § 2254(d)(1) if it "applies a rule that contradicts the governing law set forth in Supreme Court cases or confronts a set of facts that are materially indistinguishable from a decision of the Supreme Court and nevertheless arrives at a result different from that precedent." *Ryder ex rel. Ryder v. Warrior*, 810 F.3d 724, 739 (10th Cir. 2016) (internal quotation marks omitted). "A state-court decision is an 'unreasonable application' of Supreme Court precedent if the decision 'correctly identifies the governing legal rule but applies it unreasonably to the facts of a particular prisoner's case.'" *Fairchild v. Trammell*, 784 F.3d 702, 711 (10th Cir. 2015) (quoting *Williams v. Taylor*, 529 U.S. 362, 407–08 (2000)). In analyzing a state-court decision's compliance with clearly established federal law, we measure the decision against "the

governing legal principle or principles set forth by the Supreme Court at the time the state court renders its decision." *Lockyer v. Andrade*, 538 U.S. 63, 71–72 (2003). That inquiry focuses exclusively on "the holdings, as opposed to the dicta, of [the Supreme Court's] decisions as of the time of the relevant state-court decision." *Id.* at 71 (internal quotation marks omitted). "The absence of clearly established federal law is dispositive under § 2254(d)(1)." *Hooks*, 689 F.3d at 1163.

Review of a state court's factual findings under § 2254(d)(2) is similarly narrow. We will not conclude a state court's factual findings are unreasonable "merely because we would have reached a different conclusion in the first instance." *Brumfield v. Cain*, 135 S. Ct. 2269, 2277 (2015) (brackets omitted). Rather, we must defer to the state court's factual determinations so long as "reasonable minds reviewing the record might disagree about the finding in question." *Id.* Accordingly, a state court's factual findings are presumed correct, and the petitioner bears the burden of rebutting that presumption by "clear and convincing evidence." 28 U.S.C. § 2254(e)(1). But if the petitioner can show that "the state courts plainly misapprehend[ed] or misstate[d] the record in making their findings, and the misapprehension goes to a material factual issue that is central to petitioner's claim, that misapprehension can fatally undermine the fact-finding process, rendering the resulting factual finding unreasonable." *Ryder*, 810 F.3d at 739 (internal quotation marks omitted).

In determining whether the federal district court erred in denying habeas relief, "we review the district court's legal analysis of the state court decision *de novo* and

its factual findings, if any, for clear error." *Frost*, 749 F.3d at 1223 (internal quotation marks omitted). Our review is limited to the record that was before the state court that adjudicated the claim on the merits. *Id.* at 1224.

## A. *Intellectual-Disability Claim*

We first address Mr. Smith's claim that he is intellectually disabled and that the OCCA's rejection of his intellectual-disability claim is contrary to or an unreasonable application of *Atkins.* The OCCA determined this claim was procedurally barred but evaluated the merits to determine if ineffective assistance of counsel excused the procedural default. We therefore consider both the OCCA's procedural-bar and merits rulings.

### 1. Procedural Bar

Mr. Smith raised his intellectual-disability claim for the first time in his second Application for Post-Conviction Relief before the OCCA. The OCCA concluded the claim was procedurally defaulted because it was not raised on direct appeal, in Mr. Smith's first Application for Post-Conviction Relief, or within sixty days of its discovery. *Smith II*, 245 P.3d 1233, 1236 (Okla. Crim. App. 2010). But the OCCA evaluated the merits of the claim to determine whether Mr. Smith's postconviction counsel had rendered ineffective assistance that would excuse the procedural default.[5]

---

[5] The OCCA evaluated the performance of Mr. Smith's postconviction counsel based on Mr. Smith's argument that postconviction counsel had the first opportunity to raise this claim because his trial counsel also served as appellate counsel. *Smith II*, 245 P.3d 1233, 1236 (Okla. Crim. App. 2010). The OCCA assumed for purposes of

11

Finding the underlying claim of intellectual disability without merit, the OCCA

determined that postconviction counsel had not rendered ineffective assistance and

that the substantive issue was waived for failure to timely raise it. *Id.* at 1237–38. Mr.

Smith raises three separate challenges to the application of Oklahoma's procedural

bar to this claim, but we need not address those challenges because we elect to

proceed directly to the merits.

Federal habeas review is generally barred where the prisoner "defaulted his

federal claims in state court pursuant to an independent and adequate state procedural

rule," unless the prisoner can demonstrate cause for the default and "actual

prejudice" resulting from the alleged violation. *Thacker v. Workman*, 678 F.3d 820,

835 (10th Cir. 2012). However, where "the claim may be disposed of in a

straightforward fashion on substantive grounds," this court retains discretion to

bypass the procedural bar and reject the claim on the merits. *Revilla v. Gibson*, 283

F.3d 1203, 1210–11 (10th Cir. 2002). Because we conclude this claim is readily

resolved on the merits, we elect to bypass the procedural issues.

**2. Merits**

The OCCA evaluated the merits of this claim and our review is therefore

governed by AEDPA.[6] As a result, we may not grant relief unless Mr. Smith

---

its analysis that Mr. Smith's failure to raise the issue earlier was excused because he
was represented by the same counsel at trial and on direct appeal. *Id.*

[6] Mr. Smith contends that because the OCCA concluded this claim was
procedurally barred, its analysis of the claim under the ineffective-assistance rubric
does not constitute an adjudication on the merits that would subject its decision to

demonstrates the OCCA's decision is contrary to or an unreasonable application of clearly established federal law. *Fairchild*, 784 F.3d at 711. Mr. Smith contends the OCCA's rejection of his intellectual-disability claim is contrary to *Atkins v. Virginia,* 536 U.S. 304 (2002), because the OCCA's evaluation of his claim is "inconsistent with clinical practices."

    a.  Atkins *and Intellectual Disability*

In *Atkins*, the Supreme Court held that the Eighth Amendment's prohibition on "cruel and unusual punishments" forbids the execution of intellectually disabled criminal defendants. 536 U.S. at 321. But the Supreme Court declined to "provide definitive procedural or substantive guides for determining when a person who claims [intellectual disability] will be so impaired" as to be ineligible for the death penalty. *Bobby v. Bies*, 556 U.S. 825, 831 (2009) (internal quotation marks omitted). Rather, recognizing that "serious disagreement" could exist regarding who should be deemed so intellectually disabled as to be categorically excluded from execution, the Court "le[ft] to the State[s] the task of developing appropriate ways to enforce the

---

AEDPA deference. But we have held that "[w]hen a state court analyzes appellate counsel ineffectiveness as an excuse for procedural default, we must afford AEDPA deference to that analysis." *Ryder ex rel. Ryder v. Warrior*, 810 F.3d 724, 746 (10th Cir. 2016). The OCCA's analysis of postconviction counsel's performance as an excuse for procedural default is no less an adjudication of the merits than the same inquiry undertaken with respect to appellate counsel's performance. Accordingly, because the OCCA considered the merits of Mr. Smith's intellectual-disability claim in considering whether ineffective assistance excused his procedural default, we must apply AEDPA deference to the OCCA's evaluation of that claim.

13

constitutional restriction." *Atkins*, 536 U.S. at 317 (second alteration in original) (quoting *Ford v. Wainwright*, 477 U.S. 399, 405, 416–17 (1986)).

The Court in *Atkins* did, however, base its analysis on clinical definitions of intellectual disability, and the Court has since recognized that such definitions "were a fundamental premise of *Atkins*." *Hall v. Florida*, 134 S. Ct. 1986, 1999 (2014). In particular, the Court noted that "clinical definitions of mental retardation require not only subaverage intellectual functioning, but also significant limitations in adaptive skills such as communication, self-care, and self-direction that became manifest before age 18." *Atkins*, 536 U.S. at 318. And the Court observed that "an IQ between 70 and 75 or lower" is "typically considered the cutoff IQ score for the intellectual function prong of the mental retardation definition." *Id.* at 309 n.5. Most states have responded to the Court's decision in *Atkins* by incorporating clinical definitions of intellectual disability into their death-penalty frameworks.

A clinical diagnosis of intellectual disability generally requires "an IQ score that is approximately two standard deviations below the mean, considering the standard error of measurement for the specific instruments used." American Association on Intellectual and Developmental Disabilities, *Intellectual Disability: Definition, Classification, and Systems of Supports* 31 (11th ed. 2010). The mean score for a standardized IQ test is 100, and the standard deviation is approximately 15. *Hall*, 134 S. Ct. at 1994. "Thus a test taker who performs two or more standard deviations from the mean will score approximately 30 points below the mean on an IQ test, *i.e.*, a score of approximately 70 points." *Id.*

14

Every IQ test has a "standard error of measurement," or SEM, that reflects inherent imprecision in the test. *Id.* at 1995. The generally accepted SEM adjustment for assessing intellectual disability is plus or minus five points of IQ, or approximately two times the typical SEM for an IQ test. *Id.*; *accord* American Psychiatric Association, *Diagnostic and Statistical Manual of Mental Disorders* 37 (5th ed. 2013) [*DSM-5*]. "On tests with a standard deviation of 15 and a mean of 100, this involves a score of 65–75 (70 +/- 5)." *DSM-5* at 37; *accord Atkins*, 536 U.S. at 309 n.5.

Central to Mr. Smith's challenge is a theory known as the Flynn Effect, which proposes that the mean IQ score of a population increases at a rate of approximately 0.3 points per year. *Hooks v. Workman*, 689 F.3d 1148, 1169 (10th Cir. 2012). Under this theory, the result of an IQ test must be adjusted to account for how long ago the test was "normed," or compared to a representative population at that time. In theory, because the mean IQ goes up over time, a test normed years before it is given will return an inflated score relative to the current mean IQ of the population—the yardstick against which intellectual disability is measured. Accordingly, proponents of the Flynn Effect argue IQ scores must be adjusted downward by 0.3 points for each year that has passed since the test was normed to arrive at a proper measure of the test taker's IQ. *Id.* Scientific and legal acceptance of this theory is mixed. *Id.* at 1170.

b. *Oklahoma's Intellectual-Disability Statute*

Oklahoma prohibits by statute the execution of a defendant who has established intellectual disability by proving three elements: "significantly subaverage general intellectual functioning, significant limitations in adaptive functioning, and that the onset of the mental retardation was manifested before the age of eighteen (18) years." Okla. Stat. tit. 21, § 701.10b(C). The statute further provides that an "intelligence quotient of seventy (70) or below on an individually administered, scientifically recognized standardized intelligence quotient test administered by a licensed psychiatrist or psychologist is evidence of significantly subaverage general intellectual functioning." *Id.* The statute's reference to IQ as a touchstone for determining general intellectual function comes with two important qualifications: first, "[i]n determining the intelligence quotient, the standard measurement of error for the test administrated shall be taken into account." *Id.* Second, "in no event shall a defendant who has received an intelligence quotient of seventy-six (76) or above on any individually administered, scientifically recognized, standardized intelligence quotient test administered by a licensed psychiatrist or psychologist, be considered mentally retarded." *Id.*

c. *Mr. Smith's Challenge*

In support of his intellectual-disability claim, Mr. Smith offered the results of three IQ tests indicating IQ scores of 76, 79, and 71. He contended that these scores, once adjusted for the SEM and Flynn Effect, all fall below 70—within the typical range of intellectual disability. The OCCA rejected this argument, concluding first

16

that the Flynn Effect "is not a relevant consideration in the mental retardation determination for capital defendants." *Smith II*, 245 P.3d at 1237 n.6. The OCCA went on to conclude that Mr. Smith's scores of 76 or higher disqualified him from a finding of intellectual disability. The OCCA held the 76 cutoff was not subject to adjustment for the SEM because "the Legislature has implicitly determined that any scores of 76 or above are in a range whose lower error-adjusted limit will always be above the threshold score of 70." *Id.* at 1237. Because section 701.10b of the Oklahoma Statutes provides that a score 76 or higher on *any* IQ test bars a defendant from being found intellectually disabled, the OCCA concluded Mr. Smith's intellectual-disability claim failed under the express language of the statute. *Id.*

Mr. Smith argues that "Oklahoma's rigid IQ score cut-off" is contrary to and an unreasonable application of *Atkins*. Although Mr. Smith couches this argument broadly in terms of the Oklahoma law's failure to comport with clinical practices in evaluating intellectual-disability claims, the only clinical practices he identifies as relevant to our inquiry are adjustment for the SEM and the Flynn Effect.

With respect to the SEM, *Atkins* itself does not discuss the concept of the SEM, and nothing in that decision mandates adjustment of IQ scores to account for inherent testing error. Rather, the Supreme Court first held in *Hall v. Florida* that the SEM must be accounted for in evaluating an *Atkins* intellectual-disability claim. 134 S. Ct. 1986, 2001 (2014). As discussed above, our review of the OCCA's decision is normally limited to evaluating whether that decision was contrary to or unreasonably applied the holdings of the Supreme Court in force at the time it was rendered.

17

*Lockyer v. Andrade*, 538 U.S. 63, 71–72 (2003). Because *Hall* was decided more than three years after the OCCA ruled against Mr. Smith on this issue, *Hall* provides no basis for us to disturb the OCCA's decision.

But even assuming for purposes of argument that we could consider *Hall*'s holding here, section 701.10b of the Oklahoma Statutes explicitly directs courts to take into account "the standard measurement of error for the test administered" in determining if a defendant has met the "threshold requirement" of an IQ score of 70 or below. *Smith II*, 245 P.3d at 1237. And as the OCCA explained in *Smith II*, the Oklahoma legislature implicitly incorporated the SEM into the IQ cutoff of 76 by excluding from the reach of the statute those defendants whose SEM-adjusted IQ score would remain above the threshold score of 70. *Id.* That is, a score of 76 adjusted downward by 5 to account for the SEM equals 71 and therefore results in an adjusted score that falls outside the intellectual-disability threshold of 70. Because the statute's cutoff score excludes only those whose SEM-adjusted IQ score would fall outside the generally accepted range for intellectual disability, Oklahoma's statutory regime accounts for the SEM as required by *Hall*. Thus, even if subsequent Supreme Court authority is considered, Mr. Smith has failed to demonstrate the OCCA's decision is contrary to or an unreasonable application of *Hall* due to a failure to account for the SEM.

Mr. Smith's remaining challenge can therefore be distilled to a claim that the OCCA unreasonably refused to apply the Flynn Effect in considering the evidence of

his IQ.[7] His core contention is that "Oklahoma's strict construction of the intellectual-functioning element as a bright-line cutoff, with no adjustment for obsolete norms of outdated IQ tests, misunderstands and distorts the use of IQ scores." And Mr. Smith criticizes "Oklahoma's failure to adjust an IQ score for norm obsolescence," contending that his IQ test results were "inflated as a result of the growing obsolescence of the tests themselves." As discussed, the adjustment for "obsolete norms" is known as the Flynn Effect and proposes a 0.3 point reduction in a test taker's IQ score for every year since the test was "normed" by comparing it to a representative population.

This argument, however, squarely contradicts our ruling in *Hooks v. Workman*, where we explained that Oklahoma's failure to apply the Flynn Effect was not contrary to or an unreasonable application of clearly established federal law in light of *Atkins*. 689 F.3d at 1170. We concluded in *Hooks* that the threshold requirement of clearly established federal law had not been met, because *Atkins* does not mandate an adjustment for the Flynn Effect, federal and state courts are divided on the validity of applying the Flynn Effect in an *Atkins* claim, and "no decision of the Supreme Court squarely addresses the issue." *Id.* at 1170 (brackets and ellipses omitted).

---

[7] While Mr. Smith observes generally that, under Oklahoma law, "defendants who have just one IQ score above 75 *always* fall outside of *Atkins'* protection, regardless of . . . the existence of other scores below 75," he raises no specific challenge to this aspect of the law beyond his Flynn Effect claim and has not otherwise attempted to demonstrate that such a rule is contrary to federal law.

Mr. Smith contends that our holding in *Hooks* is "no longer tenable" in light of *Hall*, which he argues "made clear that clinical practices must be followed" in evaluating an *Atkins* claim. Again leaving aside whether Mr. Smith can rely on *Hall*—a decision issued more than three years after the OCCA ruled against him—*Hall* says nothing about application of the Flynn Effect to IQ scores in evaluating a defendant's intellectual disability. Rather, *Hall* focuses exclusively on the "statistical fact" of the SEM for a given IQ test and holds that the SEM must be considered in evaluating intellectual-disability claims. 134 S. Ct. at 1995. Because our review under AEDPA is limited to "the holdings, as opposed to the dicta" of the Supreme Court's decisions, *Lockyer*, 538 U.S. at 71, *Hall* provides no basis for us to depart from our conclusion in *Hooks*.[8] And Mr. Smith has identified no other Supreme Court case that has addressed the Flynn Effect at all, let alone mandated its consideration in evaluating intellectual-disability claims under *Atkins*. *Hooks* therefore controls our resolution of this issue.

Mr. Smith has failed to show that the OCCA's refusal to apply the Flynn Effect to his IQ scores was contrary to or an unreasonable application of clearly established federal law. We therefore affirm the district court's denial of habeas relief on Mr. Smith's intellectual-disability claim.

---

[8] Neither can *Hall* be read as more broadly prohibiting the application of Oklahoma's IQ cutoff score of 76. In *Hall*, the Supreme Court invalidated Florida's "strict IQ test score cutoff of 70" for intellectual-disability claims. *Hall v. Florida*, 134 S. Ct. 1986, 1994 (2014). But the Court expressly excluded from its analysis "the rule in States which use a bright-line cutoff at 75 or greater" because the petitioner had not challenged the higher IQ cutoff. *Id.* at 1996.

## B. Miranda *Waiver*

Mr. Smith next argues the OCCA's rejection of his *Miranda* claim was unreasonable because the trial court and the OCCA failed to properly apply the "totality of the circumstances" standard in assessing the validity of his *Miranda* waiver. Specifically, Mr. Smith argues the OCCA "flouted and unreasonably" applied this standard when it agreed with the trial court that Dr. Bianco's testimony regarding clinical testing of Mr. Smith's intellectual capacity was not relevant to the validity of his *Miranda* waiver. Because the OCCA addressed this claim on the merits on direct appeal, we may not grant relief unless Mr. Smith demonstrates the OCCA's decision is contrary to or an unreasonable application of clearly established federal law. *Fairchild v. Trammell*, 784 F.3d 702, 711 (10th Cir. 2015).

*Miranda v. Arizona* holds that the Fifth Amendment guarantees a suspect in custody the right to refuse questioning or to have retained or appointed counsel present during questioning. 384 U.S. 436, 444–45 (1966). A defendant may waive these rights, but any such waiver must be made "voluntarily, knowingly and intelligently." *Id.* at 444. To determine if a defendant has validly waived his *Miranda* rights, the trial court must engage in two distinct inquiries:

> First, the relinquishment of the right must have been voluntary in the sense that it was the product of a free and deliberate choice rather than intimidation, coercion, or deception. Second, the waiver must have been made with a full awareness of both the nature of the right being abandoned and the consequences of the decision to abandon it. Only if the "totality of the circumstances surrounding the interrogation" reveal both an uncoerced choice and the requisite level of comprehension may a court properly conclude that the Miranda rights have been waived.

21

*Moran v. Burbine*, 475 U.S. 412, 421 (1986) (quoting *Fare v. Michael C.*, 442 U.S. 707, 725 (1979)). "The totality approach permits—indeed, it mandates—inquiry into all the circumstances surrounding the interrogation." *Fare*, 442 U.S. at 725. These circumstances include "evaluation of the [suspect's] age, experience, education, background, and intelligence, and . . . whether he has the capacity to understand the warnings given him, the nature of his Fifth Amendment rights, and the consequences of waiving those rights." *Id.* But mental deficiency alone does not render a *Miranda* waiver invalid. *Colorado v. Connelly*, 479 U.S. 157, 164 (1986).

Mr. Smith argued on direct appeal that the trial court "failed to properly evaluate the validity of the *Miranda* waiver under the totality of the circumstances standard" because the trial court "refused to allow a neuropsychologist, Dr. Bianco, to testify at the suppression hearing as to [Mr. Smith's] intelligence." *Smith I*, 157 P.3d 1155, 1171 (Okla. Crim. App. 2007). Mr. Smith contended "Dr. Bianco's testimony was necessary to establish that [Mr. Smith] was of low intelligence and as a result was unable to comprehend the nature or consequences of the rights he was waiving." *Id.* The OCCA rejected this argument, concluding the trial court had not abused its discretion in rejecting the proposed testimony as irrelevant to the *Miranda* inquiry. *Id.* at 1171–72. And the OCCA held that the trial court had "sufficient evidence before [it] to find by a preponderance of evidence that Smith knowingly and voluntarily waived his *Miranda* rights." *Id.*

Mr. Smith argues that his intellectual capacity is relevant to whether he could offer a knowing and intelligent waiver of his *Miranda* rights, and the OCCA's

22

decision therefore "flies in the face of *Moran*, *Edwards*[ *v. Arizona*, 451 U.S. 477 (1981)], and [*Fare v.*] *Michael C.*" He contends Dr. Bianco could have provided relevant testimony regarding Mr. Smith's IQ, academic skills, reading ability, and the potential effect of his chronic PCP use on his ability to understand the waiver of his *Miranda* rights. Because the trial court rejected this testimony, Mr. Smith contends it failed to properly consider his low intelligence in the totality of the circumstances analysis, and he argues the OCCA's approval of that decision was therefore contrary to clearly established federal law.

But Mr. Smith's narrow focus on Dr. Bianco's clinical opinion ignores the trial court's broader consideration of Mr. Smith's intelligence in evaluating the validity of his *Miranda* waiver. After defense counsel offered Dr. Bianco's testimony that Mr. Smith is "borderline to low intelligence" and was "very slow in processing information," the trial court gave a detailed explanation of its findings that Mr. Smith had sufficiently understood the waiver of his *Miranda* rights. Based on its review of Mr. Smith's videotaped interview, the trial court observed that Mr. Smith was "very cocky" and "extremely verbal about how he tricks people and misleads them and has got them convinced how crazy he is"; that he "was able to plan how to switch clothes with different people and conceal his identity" to hide from police; that during the interview he was not "disoriented or unable to comprehend" but rather was "extremely animated and disturbingly explanatory about the murders he committed and how they were other people's fault"; and that he demonstrated the "ability to reason, make intelligent decisions, to co-op other people into his plan and to

23

understand perfectly the consequences of his actions as he's trying to avoid capture." Ultimately, the trial court determined that "there are many indicia[] demonstrat[ing] that [Mr. Smith] possessed intelligence" and that, during the interview, "he demonstrated in many different ways his understanding of what was going on." Accordingly, the trial court concluded that "testimony regarding his specific IQ range" would not be relevant to its assessment of his *Miranda* waiver.

The trial court's findings demonstrate that it gave fair consideration to Mr. Smith's intelligence with respect to his ability to understand the nature of the rights he was waiving and the consequences of his waiver. The trial court's findings regarding Mr. Smith's intelligence are based on the court's own observations of Mr. Smith's behavior and interactions with the detectives over the course of a nearly two-hour interview, and Mr. Smith has not rebutted the correctness of these findings. *See Ryder ex rel. Ryder v. Warrior*, 810 F.3d 724, 739 (10th Cir. 2016). Neither has Mr. Smith identified Supreme Court precedent establishing that a trial court must, when evaluating the knowing and voluntary nature of a *Miranda* waiver, assess a defendant's intelligence through expert testimony concerning the defendant's IQ score or other clinical measures of intellectual ability rather than the trial court's own observations of the defendant.

Instead, Mr. Smith seizes on a statement by the trial court, viewed in isolation, to suggest it failed to consider Mr. Smith's intelligence in assessing his *Miranda* waiver. In response to counsel's explanation that Dr. Bianco would testify as to his

24

clinical testing of Mr. Smith's intelligence, the trial court questioned whether that testimony was relevant:

> Now, the fact that he's [of] low intelligence I don't think is a huge surprise to anybody based on the fact that we all deal with criminal law and most of the Defendants who come in here are not rocket scientists. Is there any law that says that I am to take that into consideration in *Jackson v. Denno*? Even someone of low intelligence.

Mr. Smith believes this statement demonstrates "the trial court did not believe the law required her to consider Mr. Smith's low intelligence as part of the inquiry as to whether Mr. Smith knowingly and intelligently waived his *Miranda* rights." But this claim cannot be squared with the trial court's detailed discussion of Mr. Smith's intelligence and its reasons for finding his *Miranda* waiver voluntary. A more plausible interpretation is that the trial court was questioning whether it was obligated to consider expert testimony concerning clinical evidence of Mr. Smith's specific IQ. Indeed, the trial court's findings demonstrate a proper and thorough consideration of Mr. Smith's intelligence in assessing whether he voluntarily, knowingly, and intelligently waived his *Miranda* rights. Thus, Mr. Smith has not demonstrated that the OCCA's approval of the trial court's ruling was unreasonable in light of clearly established federal law, and we affirm the district court's denial of habeas relief on this claim.

### C. *Ineffective Assistance in Penalty Phase*

Mr. Smith also argues that his trial counsel rendered ineffective assistance in the investigation and presentation of mitigating evidence in the penalty phase of his trial. Mr. Smith contends the mitigation case put on by defense counsel was inadequate and failed to humanize Mr. Smith. Specifically, he claims trial counsel

25

should have instead presented evidence of his low intelligence and his troubled childhood—including evidence of physical and sexual abuse, early and continuous drug use, and childhood head injuries. The OCCA addressed these claims on the merits, and its rulings are therefore subject to deferential review under AEDPA. *Hooks v. Workman*, 689 F.3d 1148, 1163 (10th Cir. 2012).

To establish ineffective assistance of counsel, a defendant must show both that counsel's performance was deficient and that the defense was prejudiced by that deficient performance. *Strickland v. Washington*, 466 U.S. 668, 687 (1984). An insufficient showing on either element is fatal to an ineffective-assistance claim, rendering consideration of the other element unnecessary. *Id.* at 697. To demonstrate deficient performance, "the defendant must show that counsel's representation fell below an objective standard of reasonableness" when evaluated from counsel's perspective at the time. *Id.* at 688. "The question is whether an attorney's representation amounted to incompetence under prevailing professional norms, not whether it deviated from best practices or most common custom." *Harrington v. Richter*, 562 U.S. 86, 105 (2011). And to establish prejudice, the defendant must show that, but for counsel's deficient performance, there is a reasonable probability the result of the proceeding would have been different. *Strickland*, 466 U.S. at 694. Because imposition of the death sentence under Oklahoma law requires a unanimous jury, *Malone v. State*, 168 P.3d 185, 215 n.138 (Okla. Crim. App. 2007), "the question is whether there is a reasonable probability that, absent the errors, [at least

one juror] . . . would have concluded that the balance of aggravating and mitigating circumstances did not warrant death." *Strickland*, 466 U.S. at 695.

Although presented as a single claim, Mr. Smith's argument challenges two separate rulings by the OCCA. In his first Application for Post-Conviction Relief, Mr. Smith argued that trial counsel was ineffective for failing to pursue a "'reasonable' investigation into Mr. Smith's family and social history." He submitted evidence showing he was delivered by forceps and born with a swollen area on his head, his father was an abusive alcoholic, he grew up in a crime-ridden neighborhood surrounded by gangs, he struggled with school work, and he got involved in gangs at a young age. The OCCA rejected this claim, finding no prejudice when viewing the record as a whole because this new evidence was largely cumulative with the evidence presented at trial and "the slight bit of new information contained in these materials is tenuous at best." In his second Application for Post-Conviction Relief, Mr. Smith argued trial counsel was ineffective for failure to present evidence that, due to organic brain damage and the long-term effects of his PCP abuse, Mr. Smith had low intelligence and limited mental abilities. The OCCA rejected this claim on prejudice grounds as well, concluding the evidence had a "double-edged quality" because "such evidence might bolster a conclusion that the defendant represents a continuing threat to society." *Smith II*, 245 P.3d 1233, 1242–43 (Okla. Crim. App. 2010). We address the OCCA's rulings in turn.

27

### 1. Family and Social History

Mr. Smith contends the OCCA's rejection of the ineffective-assistance claim in his first Application for Post-Conviction Relief was based on an unreasonable determination of the facts.[9] We will not conclude that a state court's determination of the facts is unreasonable unless the court plainly and materially misstated the record or the petitioner shows that reasonable minds could not disagree that the finding was in error. *Ryder ex rel. Ryder v. Warrior*, 810 F.3d 724, 739 (10th Cir. 2016).

In support of his first Application for Post-Conviction Relief, Mr. Smith submitted affidavits from family members recounting details of Mr. Smith's childhood: that his father and other family members imposed harsh physical discipline or abuse; that his father was an alcoholic and abusive toward his mother until his parents separated when Mr. Smith was approximately two years old; that Mr. Smith was introduced to drugs and gangs at a young age by his brothers; that Mr. Smith was born with a swollen area on his head, was delivered by forceps, and suffered other head injuries as a child; and that Mr. Smith was sexually abused by an older woman when he was seven or eight years old. Mr. Smith also attached a protective order his mother had obtained against his father, in which she stated that Mr. Smith's father was "very violent" and had threatened "to kill and to fight" her.

In rejecting Mr. Smith's claim, the OCCA stated the "affidavits and documents establish a larger quantity of mitigating evidence than was presented at trial, but

---

[9] Mr. Smith has presented no argument that the OCCA's ruling on this point was contrary to or an unreasonable application of clearly established federal law.

28

cover little new ground." The OCCA observed that the evidence tended to show "Smith's father was an alcoholic, that he was abusive, . . . that Smith was a gang member," and "that Smith grew up in a neighborhood known for gang activity, violence, and drug activity." In the OCCA's view, this information had, "in one form or another," already been developed at trial. The OCCA also noted Mr. Smith had failed to connect the evidence of childhood head injuries to any then-current medical diagnoses of brain damage, intellectual disability, or other impairment.[10] And the OCCA concluded that the "slight bit of new information" was "tenuous at best." The OCCA therefore concluded that, "when the materials are viewed as a whole," there was no reasonable probability the outcome of Mr. Smith's sentencing would have been different. Accordingly, the OCCA rejected Mr. Smith's ineffective-assistance claim on prejudice grounds without evaluating trial counsel's performance.

Mr. Smith argues the OCCA's factual determinations are unreasonable for two reasons. First, he challenges as "patently unreasonable" the OCCA's conclusion that the relevant information had been developed at trial and that the postconviction materials therefore "cover[ed] little new ground." While Mr. Smith concedes the jury heard evidence of his father's "criminal behavior" and "Mr. Smith's exposure to gangs through older brothers," he contends the jury never heard about the "sexual

---

[10] At the time the OCCA ruled on this claim, Mr. Smith had yet to present to the OCCA the opinion of Dr. Saint Martin, who diagnosed Mr. Smith with intellectual disability and opined that his intellectually disability could have been caused, in part, by "genetics or intrauterine developmental problems" that a childhood head injury "could have worsened."

29

and physical abuse Mr. Smith suffered as a child," the head injuries Mr. Smith experienced, or "the extent of the violence perpetrated" by his father against his mother.

But even if the OCCA mischaracterized the specific contours of the evidence that had been placed before the jury, and even assuming for purposes of our analysis that the OCCA's factual error was unreasonable, Mr. Smith has failed to demonstrate that error entitles him to habeas relief. Under § 2254(d)(2), "an unreasonable determination of the facts does not, itself, necessitate relief." *Byrd v. Workman*, 645 F.3d 1159, 1172 (10th Cir. 2011) (internal quotation marks omitted). Rather, a habeas petitioner must demonstrate that the state court's decision is "based on"—i.e., "rests upon"—that unreasonable determination of the facts. *Id.*

Mr. Smith has failed to make the necessary showing with respect to the OCCA's analysis of prejudice under *Strickland*. In pressing this argument, Mr. Smith makes no real attempt to explain how this purported factual error undermined the OCCA's *Strickland* analysis. Rather, he merely asserts that, had the jury been presented with additional mitigation evidence, "there is a reasonable probability at least one [juror] would have arrived at a sentence less than death." But that claim illustrates only that Mr. Smith disagrees with the OCCA's ultimate determination that he suffered no prejudice; it says nothing about whether the OCCA's prejudice decision was "based on" an erroneous factual finding.

Mr. Smith's failure to explain the relationship between the alleged error and the OCCA's analysis is fatal when considering the prejudice standard the OCCA was

30

required to apply. In evaluating whether prejudice resulted from the omission of mitigation evidence, the OCCA was obligated to consider the totality of mitigation evidence before it—both that adduced at trial and that adduced in the postconviction proceeding—and to reweigh the combined mitigation evidence against the aggravation evidence presented by the state. *Williams v. Taylor*, 529 U.S. 362, 397–98 (2000). The OCCA was then required to consider whether, in light of the old and new evidence taken together, a reasonable likelihood existed that one or more jurors would have voted against the death penalty. *Strickland*, 466 U.S. at 695. Mr. Smith has made no attempt to explain how the OCCA's alleged misunderstanding of whether certain evidence had been first presented at trial or in Mr. Smith's Application for Post-Conviction Relief affected its analysis of whether the totality of the mitigation evidence gave rise to a reasonable probability of a non-death verdict. Moreover, the OCCA stated that its prejudice determination was based on a review of the evidentiary materials as a whole, and Mr. Smith does not argue the OCCA failed to properly apply the correct standard. Accordingly, Mr. Smith has failed to demonstrate that the OCCA's prejudice decision was "*based on* an unreasonable determination of the facts." 28 U.S.C. § 2254(d)(2) (emphasis added).

Second, Mr. Smith challenges the OCCA's characterization of the evidence presented in support of his first Application for Post-Conviction Relief as "slight," and "tenuous at best." He asserts this characterization is unreasonable because it fails to recognize the relevance of a disadvantaged background to the issue of moral culpability. However, the OCCA's characterization of the evidence as "slight" and

31

"tenuous" is a matter of weight, not relevance. Mr. Smith's argument thus advances nothing more than his disagreement with the weight afforded to this evidence by the OCCA. But neither his disagreement, nor even this court's disagreement, can render a state court's weighing of the evidence unreasonable. *Brumfield v. Cain*, 135 S. Ct. 2269, 2277 (2015). Rather, Mr. Smith was required to show that "reasonable minds reviewing the record" could not disagree that the OCCA's determination that he had not been prejudiced by counsel's performance was erroneous. *Id.* (internal quotation marks omitted). He has not undertaken to do so and, based on our review of the record, we conclude that reasonable minds could differ on this point. We must therefore defer to the OCCA's evaluation of the evidence presented in Mr. Smith's first Application for Post-Conviction Relief.

Mr. Smith has failed to demonstrate the OCCA unreasonably concluded he was not prejudiced by trial counsel's failure to present the omitted family- and social-history evidence in mitigation. Because the OCCA reasonably concluded that Mr. Smith suffered no prejudice, we do not consider whether trial counsel rendered deficient performance by failing to present this evidence. We therefore affirm the district court's denial of habeas relief on this aspect of Mr. Smith's ineffective-assistance claim.

## 2. Low Intelligence and Drug Use

We next consider Mr. Smith's challenge to the OCCA's rejection of the claim—raised in his second Application for Post-Conviction Relief—that his trial counsel was ineffective for failure to present evidence of his low intelligence due to

organic brain damage and long-term PCP use. He contends the OCCA's determination that no prejudice stemmed from the omission of this "double-edged" evidence is contrary to *Sears v. Upton*, 561 U.S. 945 (2010). We will conclude a state-court decision is contrary to governing federal law only if it applies a contradictory rule or confronts a set of facts materially indistinguishable from Supreme Court precedent and arrives at a different result. *Ryder*, 810 F.3d at 739.

In his second Application for Post-Conviction Relief, Mr. Smith argued that trial counsel was "ineffective for failing to provide Mr. Smith's jury with evidence that he suffers from organic brain damage and low intelligence" because "[t]rial counsel failed to investigate the long term effects of phencyclidine (PCP) use and abuse." "If counsel had done this investigation," Mr. Smith contended, "they could have presented powerful mitigation evidence to the jury." In support of this claim, Mr. Smith relied on reports from Drs. Manuel Saint Martin and Deborah Mash, who both opined that Mr. Smith's long-term use of PCP likely contributed to brain damage and lowered intelligence. Mr. Smith specifically quoted Dr. Saint Martin's conclusions regarding the effect of drug use on his developing brain:

> [T]he clinical picture for Mr. Smith is . . . childhood/adolescent brain insult caused by substance abuse.
> . . . .
> The substances linked to neural damage in Mr. Smith's developing brain are PCP, alcohol and marijuana. PCP is known to produce dissociative states and symptoms similar to schizophrenia. Long term use of PCP is neurotoxic in rat and primate brains, and in humans it inhibits the brain's ability to learn new information.
> . . . .

33

>The tests indicate non-specific brain damage affecting his attention, calculation, and short term memory. These . . . neuropsychological deficits could be due to Mr. Smith's substance use, especially PCP . . . .

(Alteration and omissions in original.) Mr. Smith also quoted Dr. Mash's opinion that "[t]he early exposure to PCP and [Mr. Smith's] chronic use contributed to diffuse impairment of cognitive functioning" and "Mr. Smith's [early] exposure [and chronic use of] 'wet' undoubtedly contributed to developmental brain abnormalities . . . ."[11] (Alterations and omission in original.)

The OCCA rejected Mr. Smith's ineffective-assistance claim. Limiting its analysis to prejudice, the OCCA concluded this evidence has a "double-edged quality," and noted that a "a jury presented with evidence that the defendant is a chronic substance abuser might draw a negative inference from that evidence just as easily as it might find it mitigating." *Smith II*, 245 P.3d at 1242–43. The OCCA also noted, in the context of Mr. Smith's case, "such evidence might bolster a conclusion that the defendant represents a continuing threat to society, one of the aggravating circumstances charged." *Id.* at 1243. The OCCA accordingly concluded that Mr. Smith failed to demonstrate "a reasonable probability that the jury would have reached a different sentencing result if it had been presented with evidence of [Mr. Smith's] chronic use of PCP and its allegedly attendant brain damage." *Id.*

---

[11] According to Dr. Mash, "wet" is slang for a method of PCP ingestion that involves "dipping cigarettes or marijuana cigarettes in liquid PCP" or a solution of PCP and embalming fluid.

Mr. Smith raises three challenges to the OCCA's conclusion. First, he argues the OCCA unreasonably "presupposed that Mr. Smith's organic brain damage and low intelligence [were] caused by long-term daily use of [PCP]." (Alterations in original, internal quotation marks omitted.) He contends that Dr. Saint Martin attributed only some of his impairments to PCP use but "made clear there is evidence from [Mr. Smith's] school records and developmental history that he had significant intellectual impairments *before* he began using illicit substances." (Internal quotation marks omitted.) Thus, he claims, "[a]ny statement that Mr. Smith's intellectual limitations were caused exclusively by his substance abuse is objectively unreasonable."

In making this argument, Mr. Smith ignores his own briefing of the claim in his second Application for Post-Conviction Relief. As discussed above, Mr. Smith's argument before the OCCA focused exclusively on his drug abuse as a cause of brain damage and low intelligence. Indeed, in presenting Dr. Saint Martin's opinion to the OCCA, Mr. Smith omitted language from the quoted portions of Dr. Saint Martin's report that attributed Mr. Smith's "mental retardation" to "prenatal or idiopathic brain insult" and opined that his neuropsychological deficits could also be due to "the factors causing his idiopathic mental retardation." The OCCA's view of Mr. Smith's theory as claiming that his alleged brain damage and low intelligence were caused by his history of drug abuse is not unreasonable in light of Mr. Smith's selective quotation of his own experts' opinions to present precisely that picture to the court.

Second, Mr. Smith contends the OCCA's characterization of this evidence as having a "double-edged quality" is contrary to established Supreme Court precedent. Mr. Smith contends the Supreme Court "rejected the 'double-edged' characterization of this type of mitigating evidence" in *Sears*. In particular, he relies on the Court's statement in *Sears* that "[c]ompetent counsel should have been able to turn some of the adverse evidence into a positive—perhaps in support of a cognitive deficiency mitigation theory." 561 U.S. at 951. Thus, Mr. Smith contends, *Sears* constitutes a clearly established rejection of the "double-edged" theory of prejudice employed by the OCCA.

We cannot agree that *Sears* clearly prohibits courts from considering the "doubled-edged" nature of mental-health and substance-abuse evidence in evaluating prejudice resulting from its omission during the penalty phase of trial. We first note that Mr. Smith relies on a portion of *Sears* discussing the attorney-performance element of the petitioner's *Strickland* claim, not prejudice. Thus, to the extent *Sears* can be read as establishing a general rule relating to the handling of this type of evidence, it establishes at best that an attorney's failure to use evidence of "substantial deficits in mental cognition and reasoning" in some positive fashion may constitute deficient performance. But because the OCCA never reached the issue of deficient performance, *Sears* does not control our analysis here.[12]

---

[12] The Court in *Sears* did determine the state court's analysis of prejudice was flawed, but it did so on a different ground. *Sears v. Upton*, 561 U.S. 945, 954–56 (2010). The state trial court had failed to consider both the newly uncovered evidence

36

Moreover, the Supreme Court has explicitly recognized that mental-health evidence, including evidence of low intelligence, can have a double-edged impact on the jury. In *Atkins v. Virginia*, the court specifically noted that the intellectually disabled face "a special risk of wrongful execution" in part because "reliance on mental retardation as a mitigating factor can be a two-edged sword that may enhance the likelihood that the aggravating factor of future dangerousness will be found by the jury." 536 U.S. 304, 321 (2002). And subsequent to *Sears*, in *Cullen v. Pinholster*, the Court reiterated the principle, citing *Atkins* for the proposition that "mitigating evidence can be a 'two-edged sword' that juries might find to show future dangerousness." 563 U.S. 170, 201 (2011). Like this case, *Cullen* involved a claim of ineffective assistance for trial counsel's failure to introduce mitigating evidence. There, the Court concluded that the bulk of new evidence presented by the petitioner in support of his state habeas petition—evidence that he suffered from bipolar mood disorder and that his family had a history of "serious substance abuse, mental illness, and criminal problems"—was of "questionable mitigating value" because it could have opened the door to rebuttal and may have convinced the jury the petitioner "was simply beyond rehabilitation." *Id.* Because the other new evidence presented by the petitioner was "sparse," the Court held the state court did

---

and the evidence introduced at trial in weighing the probability of a different sentencing result. *Id.* at 955–56. Accordingly, the Supreme Court remanded for the state court to perform a proper prejudice analysis. *Id.* at 956.

37

not unreasonably conclude that the petitioner had failed to demonstrate prejudice under *Strickland*. *Id.* at 202.

From these decisions, it is apparent the Supreme Court did not clearly establish in *Sears* that mental-health and substance-abuse evidence cannot be viewed as "double-edged" in evaluating the prejudicial effect of omitting such evidence in the penalty phase.[13] "The absence of clearly established federal law is dispositive under § 2254(d)(1)." *Hooks v. Workman*, 689 F.3d 1148, 1163 (10th Cir. 2012) (internal quotation marks omitted).

Last, Mr. Smith argues more generally that the OCCA's prejudice determination was unreasonable. We interpret this challenge as a claim that the OCCA unreasonably applied the *Strickland* analysis. He contends "the OCCA's reliance on the role of the continuing threat aggravating circumstance" is unreasonable because the jury "had already heard the State's case in aggravation, including evidence of Mr. Smith's behavior." Although Mr. Smith does not develop this argument further, he presumably seeks to liken his case to those like *Smith v. Mullin*, where we have concluded that the aggravating "edge" of the evidence was blunted because the negative aspects of the evidence had already been placed before the jury. 379 F.3d 919, 943 & n.11 (10th Cir. 2004). But Mr. Smith does not explain how the aggravating edge of this evidence—that damage to his brain was caused or

---

[13] Mr. Smith also contends our own precedents "foreclose a finding of no prejudice on the 'double-edged' characterization." But none of the decisions Mr. Smith cites have addressed the dispositive question here: whether the Supreme Court has clearly established the rule he seeks to apply to the OCCA's decision.

exacerbated by habitual drug use—was before the jury in such a way that it was unreasonable for the OCCA to conclude the evidence was likely to be as harmful to him as helpful. Absent such a showing, we cannot conclude the OCCA's application of *Strickland* was unreasonable.[14]

Mr. Smith has failed to demonstrate the OCCA unreasonably concluded he was not prejudiced by his trial counsel's failure to present additional evidence in mitigation. Absent a showing of prejudice, his claims under *Strickland* must fail. We therefore affirm the district court's denial of habeas relief on Mr. Smith's ineffective-assistance claims.

## D.  *Cumulative Error*

As a final point, Mr. Smith contends he is entitled to relief on the basis of cumulative error. "A cumulative-error analysis aggregates all errors found to be harmless and analyzes whether their cumulative effect on the outcome of the trial is such that collectively they can no longer be determined to be harmless." *Cargle v. Mullin*, 317 F.3d 1196, 1206 (10th Cir. 2003). "The cumulative-error analysis applies where there are two or more actual errors. It does not apply, however, to the cumulative effect of non-errors." *United States v. Franklin-El*, 555 F.3d 1115, 1128 (10th Cir. 2009) (internal quotation marks omitted). Respondent contends our review

---

[14] Mr. Smith also contends the OCCA failed to properly conduct a totality of the evidence review under *Strickland* and "considered *only* Mr. Smith's 'chronic use of PCP and its allegedly attendant brain damage,'" rather than all of the evidence offered in mitigation, to evaluate prejudice. Mr. Smith has identified nothing in the OCCA's decision to suggest its analysis was so limited, and we can identify nothing that lends merit to Mr. Smith's claim.

of this claim is constrained by AEDPA and that no clearly established federal law recognizes cumulative error as a ground for habeas relief. However, because we can easily resolve these claims on the merits, it is not necessary for us to evaluate what deference may be owed to the OCCA under the circumstances.

Mr. Smith identifies what he terms two "clusters" of error that he contends cumulatively deprived him of a fair trial. With respect to the first cluster, Mr. Smith argues his trial counsel's ineffectiveness, his claimed intellectual disability, and the admission of his confession "individually and in combination resulted in an unreliable sentence of death." Because we have concluded that the OCCA did not unreasonably reject Mr. Smith's *Atkins* claim or his challenge to the admission of his confession, there are not "two or more actual errors" to cumulate with respect to this claim. *Id.* (internal quotation marks omitted).

The second cluster of errors Mr. Smith identifies involves the admission of his confession compounded with the trial court's error in responding to a jury question outside the presence of Mr. Smith's counsel, an error the OCCA recognized on direct appeal. Because we have concluded the OCCA did not unreasonably reject Mr. Smith's challenge to the admission of his confession, there is only one error—the trial court's response to the jury's question—and, therefore, nothing for us to cumulate.

Thus, Mr. Smith has failed to demonstrate that the cumulative effect of two or more errors had a prejudicial effect on the outcome of his trial, and he is not entitled to habeas relief on this claim.

40

## IV. CONCLUSION

Mr. Smith has failed to demonstrate that the OCCA's decisions on his intellectual disability, *Miranda* waiver, or ineffective-assistance claims were unreasonable. The district court properly denied habeas relief on each of Mr. Smith's claims. We therefore AFFIRM the judgment of the district court.